STATE OF NORTH CAROLINA v. BOBBY RAY HIGHTOWER

No. 375A94

(Filed 28 July 1995)

### 1. Evidence and Witnesses § 190 (NCI4th)— first-degree murder—mental condition of victim—testimony excluded

The trial court did not err in a first-degree murder prosecution in excluding expert testimony concerning the victim's mental condition. Although defendant contended that the excluded evidence consisted of expert testimony that the victim suffered from a manic-depressive illness which caused various problems, including irritability and hostility, that this was admissible to corroborate defendant's claim that he killed the victim after she resisted his effort to end their relationship and became assaultive, and that the excluded testimony was thus relevant to disprove premeditation and deliberation, the undisputed evidence, including evidence that the victim was attempting to withdraw from a confrontation with defendant at the time of the murder, shows premeditation and deliberation on the part of defendant regardless of the victim's mental condition. The victim's actions in this case, regardless of mental condition, did not

constitute sufficient provocation to negate premeditation and deliberation on the part of defendant.

**Am Jur 2d, Evidence § 559.**

2. **Evidence and Witnesses § 761 (NCI4th)— first-degree murder—defendant's relationship with victim—testimony excluded—no prejudice**

There was no prejudicial error in a first-degree murder prosecution in the exclusion of testimony by defendant's neighbor that defendant had told her that he tried to break off his relationship with the victim but that she would not let him, that he was reconciling with his wife, and that the victim had threatened to tell defendant's wife that she was pregnant. Assuming that this evidence was relevant, similar undisputed testimony was before the jury.

**Am Jur 2d, Appellate Review § 759.**

3. **Evidence and Witnesses § 649 (NCI4th)— first-degree murder—testimony of prior assaults by defendant—motion to prohibit cross-examination concerning—ruling refused**

There was no error in a first-degree murder prosecution where defendant questioned his former wife on *voir dire* concerning the victim's harassing conduct toward her and defendant, the State cross-examined her about defendant's previous assaults against her, defendant argued that questions concerning the assaults were not admissible, the court ruled that the testimony elicited by defendant on direct was admissible but declined to rule on the cross-examination by the State, defendant requested a ruling on the question later in the trial, and the court indicated that he would listen to the cross-examination and make rulings as the trial proceeded. Defendant's motion, although not made as a pretrial motion, appears to be in the nature of a *motion in limine*, which is in the discretion of the trial judge. It cannot be said that the State would have offered evidence so highly prejudicial that a curative instruction would not have prevented prejudice. Defendant was free to call the witness and retained the right to object to any questions asked by the State on cross-examination. Not calling the witness was a purely tactical decision; defendant's right to testify on his own behalf was not implicated and the statements by the State were not necessarily inadmissible.

**Am Jur 2d, Trial § 112.**

**Modern status of rules as to use of motion in limine or similar preliminary motion to secure exclusion of prejudicial evidence or reference to prejudicial matters. 63 ALR3d 311.**

### 4. Criminal Law § 490 (NCI4th)— first-degree murder—publicity during trial—no inquiry of jury

There was no error in a first-degree murder prosecution where the trial court declined to ask sitting jurors if they had read a newspaper article which appeared during the trial over a weekend and which stated that defendant had previously been convicted and sentenced to death. The judge stated that he had told each member of the jury numerous times not to read anything about the case and to decide the case on the evidence, expressed concern about provoking the jury's curiosity, and found that this jury panel was responsible and would follow his instructions. The trial judge is in the best position to observe the jury; additionally, the judge's finding here was supported by the fact that at least one member of the jury had openly indicated that he had followed the court's instructions by refusing to talk about the case.

**Am Jur 2d, Trial § 1641.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by Mills, J., at the 11 October 1993 Criminal Session of Superior Court, Guilford County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 11 April 1995.

*Michael F. Easley, Attorney General, by Barry S. McNeill, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Gordon Widenhouse, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

On 4 January 1988, defendant was indicted for first-degree murder in the death of Naomi Donnell. At defendant's first trial, a jury found defendant guilty of first-degree murder and recommended that the death penalty be imposed. On appeal, this Court found error in the jury selection phase of defendant's trial and ordered a new trial. *State v. Hightower*, 331 N.C. 636, 417 S.E.2d 237 (1992). Defendant was

retried, and on 19 October 1993, a jury returned a verdict finding defendant guilty of first-degree murder. Following a capital sentencing proceeding, the same jury failed to find the sole aggravating circumstance submitted, and the trial court entered judgment sentencing defendant to a term of life imprisonment.

On appeal, defendant brings forward three assignments of error. After a thorough review of the transcript of the proceedings, record on appeal, briefs, and oral arguments, we conclude that defendant received a fair trial free from prejudicial error, and we therefore affirm his conviction and sentence.

The evidence presented at trial tended to show the following: In November 1987, Naomi Donnell lived with her mother and stepfather in High Point, North Carolina. Naomi was eighteen years old at this time. Naomi's mother, Harriet Donnell Stamps, testified that her daughter dated defendant, beginning in January 1987. In March or April of that year, Ms. Stamps "had gotten the news" that defendant was married and confronted defendant with this information. Ms. Stamps testified that defendant admitted to her that he was married but that he also stated that he was legally separated from his wife.

Ms. Stamps also testified that in October 1987, defendant came over to her house to visit. During this visit, defendant asked Ms. Stamps, "has Naomi told you the news about us and what we're looking for?" Ms. Stamps testified that she responded by asking if they were looking for an apartment and that defendant laughed and stated, "No," they were "looking for" a baby.

On 11 November 1987, defendant called Ms. Stamps' house and asked to speak with Naomi about their "problem." Ms. Stamps called Naomi to the phone, and Naomi picked up the other phone in the living room. Ms. Stamps testified that she listened to their conversation and that she heard defendant ask Naomi if she had any plans for that night or the next day because he wanted to talk to her. Naomi told defendant that she was not free that night and that she would be at the grocery store with her mother the next day. Ms. Stamps testified that defendant told Naomi that he wanted to meet her and that when Naomi asked him what he wanted to meet with her about, defendant stated, "I've finally got a solution to our problem, and we need to talk." Ms. Stamps testified that Naomi and defendant made plans to meet.

The following night, 12 November 1987, at approximately 10:00, Naomi went to the grocery store with her parents. After they had been in the store about five minutes, Naomi went outside, came back, and told her mother that defendant was there and that she was "getting ready to ride out." Ms. Stamps testified that she told Naomi not to be late and that Naomi told her that she would be home between 11:30 and 12:00. Ms. Stamps further testified that this was the last time she saw her daughter alive.

Deputy James Church of the Guilford County Sheriff's Department testified that on 13 November 1987, he responded to a call at a bridge on Troxler Mill Road concerning a body that had been spotted floating in the Haw River. Deputy Church testified that he arrived on the scene at approximately 4:00 p.m. and that he and some volunteer firemen pulled the body out of the water. Deputy Church observed that the body was that of a black female with "slash" or "gash" wounds about her neck area and chin. The body was later identified as Naomi Donnell's.

Captain R.T. Forrest of the Guilford County Sheriff's Department testified that he arrived on the scene at approximately 5:29 p.m. the day the body was found and that in response to information he received from another officer, he searched the area of a nearby mill. Captain Forrest testified that in the mill area, he observed a clearly defined path that went around the back of the mill through a grassy area between the mill and the riverbank. Captain Forrest further testified that on the riverbank in this area, he observed bloodstains on the rocks and leaves and vertical marks that "looked like someone had slid down, or fallen down, the bank." Captain Forrest testified that there was an eight- to nine-foot drop from the bank of the river to the rocky water's edge.

Dr. Robert L. Thompson, a forensic pathologist, supervised the autopsy of Naomi Donnell. Dr. Thompson testified that he observed a series of wounds on the body, including thirteen stab wounds, three cut or incised wounds, and numerous abrasions, lacerations, and bruises. Dr. Thompson testified that in his opinion, the two stab wounds in the upper left and right side of the back were the cause of the victim's death. Dr. Thompson also testified that the autopsy revealed that at the time of her death, Naomi Donnell was fifteen weeks pregnant.

On 16 November 1987, Captain Forrest and Detective Jackson questioned defendant at the Guilford County Sheriff's Department

about his relationship with Naomi. Captain Forrest testified that defendant told him that he knew Naomi because he went to school with her older sister and brother and that he had been seeing her "for a few months prior." Defendant told Captain Forrest that at the time he was seeing Naomi, he was separated from his wife. Captain Forrest testified that defendant was in fact living with his wife at the time of this interview.

Captain Forrest further testified that defendant told him that he agreed to meet with Naomi the night of 12 November 1987 at a Kroger's grocery store. Defendant told Captain Forrest three different versions of the events that occurred on the night of 12 November 1987, and, following the third version, Detective Jackson stated, "Bobby, you killed her, didn't you?" Captain Forrest testified that in response to this question, defendant "began to tear up, and he dropped his head and just nodded, 'Yes,' up and down." Captain Forrest then asked defendant to tell them what had happened.

Defendant's statement was reduced to writing and signed by defendant. Captain Forrest read the following narrative portion of defendant's written statement into evidence:

"On Thursday, November 12, 1987, I got a phone call from Naomi Donnell. I was home when I got the call. She said she needed to see me. She asked me if I could meet her. I asked, 'When?' She told me her father would be getting off of work at 9:30 p.m. She asked if I could meet her at Kroger's on High Point Road about 30 minutes after that. I went to Kroger's on High Point Road. I got there about 10:00 p.m. Naomi arrived about the same time. She was with her parents. She went inside with them. A few minutes later, I went into the store to see her. She was sitting in the cafe part. She went and talked to her mother and told her mother that she was going to the movies. I went back out to my car. She came out about 15 minutes later. When she got out to the car, we argued because she wanted to go to the movies and I said, 'No.' She threatened to tell everyone she was pregnant if I didn't take her to the movies. We left Kroger's and went to Cedrow Park in High Point. We sat there for about five minutes. I started to take her home, but she would not get out of the car when we got to her street. I told her I wanted to end our relationship. She asked me if I would take her up to Caswell County to a dirt road off Highway 86 where we had once made love. I took her to that road. We sat there for a while. We talked about how things used to be,

and she told me it could be that way again. I told her I didn't want it to be that way. I told her that I had felt guilty about cheating on my wife, and what we had done was a mistake. She started crying. She got upset with me when I left from there. As I started towards Greensboro, she started grabbing the steering wheel, trying to make me run off the road. She slapped me a couple of times. I was on Troxler Mill Road then. I had just got [sic] back inside Guilford County. I stopped the car after I crossed the bridge at Haw River. I tried to calm her down and reason with her, but she kept fussing. She also kept trying to hit me. She got out of the car and started to walk up the hill. I tried to stop her, and she kicked me in the groin. I went back to the car and got a boner knife I had in the trunk. I was going to make her get back in the car. When I got the knife, she was walking fast up the road. When I caught up with her, she was on the dirt road down by the mill. She started hitting me, and tried to kick me again. I stepped back. She turned around, and that's when I stepped up behind her and stabbed her in the back with the knife. Before I realized it, I had stabbed her twice in the back. She fell down on the ground and called my name out once. I stabbed her one more time in the left side. I don't remember if I stabbed her anymore. I drug [sic] the body off behind the mill and rolled it down into the river. The body fell on some rocks. I climbed down the hill and pushed her into the water. I got back into the car and put the knife in the glove box. I drove back to Greensboro. I went to Bingham Street Park. I stayed there for a couple of hours. Then, I went home. I washed the knife and put it with the set . . . it came from in the cupboard that sets [sic] between the stove and the bar."

After defendant gave his statement, he consented to a search of his residence. Captain Forrest testified that he went with defendant to his residence and that defendant retrieved a knife from a box in the kitchen and indicated to Captain Forrest that it was the knife he had used to kill Naomi. Thereafter, Captain Forrest accompanied defendant to the murder scene, and defendant showed him where the events in his statement concerning the murder had occurred.

## I.

[1] First, defendant contends that the trial court erred in excluding expert testimony concerning Naomi Donnell's mental condition. Because the excluded evidence was irrelevant to any fact in issue, we disagree.

"Evidence which is not relevant is not admissible." N.C.G.S. § 8C-1, Rule 402 (1992). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992).

In the present case, the excluded evidence consisted of expert testimony that Naomi suffered from a manic-depressive illness which caused her to have poor self-monitoring skills, a decreased capacity to appreciate the impact of her behavior on others, heightened sexual needs, increased irritability, paranoia, possessive behavior, jealousy, and hostility. The excluded evidence also consisted of testimony that she had physically assaulted a previous boyfriend and that she had discontinued taking her medication and refused treatment, as well as expert opinion testimony that on the night of her murder, "she was clearly out of control."

Defendant argues that this testimony was admissible to corroborate his claim that he killed the victim after she resisted his effort to end their relationship and became assaultive. Based on this argument, defendant contends the excluded testimony was relevant to disprove premeditation and deliberation and by establishing "a reasonable inference of some provocation and the lack of a killing in a cool state of mind" from which the jury could have found defendant guilty of second-degree murder instead of first-degree murder. Because we conclude that regardless of the victim's mental condition, the undisputed evidence shows premeditation and deliberation on the part of defendant, we disagree.

"Murder in the first degree is the unlawful killing of another human being with malice and with premeditation and deliberation." *State v. Watson*, 338 N.C. 168, 176, 449 S.E.2d 694, 699, *reconsideration denied*, 338 N.C. 523, 457 S.E.2d 302 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 569 (1995); *accord* N.C.G.S. § 14-17 (1993). "Murder in the second degree is the unlawful killing of another human being with malice but without premeditation and deliberation." *Watson*, 338 N.C. at 176, 449 S.E.2d at 699 (citing *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983)).

" 'Premeditation is defined as thought beforehand for some length of time; deliberation means an intention to kill, executed by defendant in a "cool state of blood" in furtherance of a fixed design or to accomplish some unlawful purpose.' " *State v. Bell*, 338 N.C. 363,

388, 450 S.E.2d 710, 724 (1994) (quoting *State v. Jones,* 303 N.C. 500, 505, 279 S.E.2d 835, 838 (1981)), *cert. denied,* —— U.S. ——, —— L. Ed. 2d ——, 63 U.S.L.W. 3906 (1995). "In this context, the term 'cool state of blood' does not mean the perpetrator was devoid of passion or emotion." *State v. Olson,* 330 N.C. 557, 564, 411 S.E.2d 592, 595-96 (1992) (citing *State v. Vause,* 328 N.C. 231, 238, 400 S.E.2d 57, 62 (1991)).

"The fact that defendant was angry or emotional at the time of the killing will not negate the element of deliberation unless such anger or emotion was strong enough to disturb the defendant's ability to reason." *State v. Solomon,* 340 N.C. 212, 222, 456 S.E.2d 778, 785 (1995) (citing *State v. Fisher,* 318 N.C. 512, 517, 350 S.E.2d 334, 338 (1986)). "What is required to negate deliberation . . . is a sudden arousal of passion, brought on by sufficient provocation during which the killing immediately takes place." *Watson,* 338 N.C. at 178, 449 S.E.2d at 700.

In the present case, defendant's version of events tends to show the following: The night of the murder, Naomi argued with defendant as a result of defendant's attempt to break off his relationship with her. Naomi was angry with defendant, slapped him a couple of times, and attempted to run his car off the road by grabbing the steering wheel. However, after defendant stopped the car, she withdrew from the argument by getting out of the car and walking away from defendant, toward the road. Defendant did not drive away. Instead, defendant got out of the car and actively pursued her.

When defendant overtook Naomi, she kicked him in the groin. Defendant then walked back to his car, opened the trunk, and retrieved a ten-inch boner knife. Defendant walked back toward the victim with the knife. Naomi did not confront defendant; instead, in defendant's own words, she was "walking fast up the road" away from defendant at this time. Defendant again actively pursued her and caught up with her on the dirt road by the mill. Defendant grabbed Naomi, and she attempted to kick him. She then turned her back to defendant and again began walking away from him toward the car. Although defendant stated that he had gotten the knife "to make her get back in the car," it was at this point, when Naomi had her back to defendant and was walking back toward the car, that defendant stabbed her twice in the back. Naomi called defendant's name and fell to the ground, and defendant stabbed her a third time in her left side. She did not move or make any additional sounds after that. Defendant

then dragged her body around the mill, rolled it down the riverbank, climbed down the riverbank, and pushed her body into the water.

Defendant argues that this evidence shows that he acted under the provocation arising from his quarrel with the victim which negated his premeditation and deliberation. The foregoing evidence clearly shows, however, that at the time of the murder, the victim was attempting to withdraw from a confrontation with defendant and that any attempts by Naomi at hitting or kicking defendant on or near the dirt road prior to his stabbing her were the direct result of defendant's pursuit of her. Further, there was evidence tending to show preparedness on the part of defendant to kill the victim before the argument between them ensued. Before their argument, defendant picked the victim up in his car with the murder weapon in the trunk, a knife which defendant kept with a set of knives in his cupboard. Defendant had made plans to meet with the victim that night in order to discuss a "solution" to their "problem." Defendant had just reconciled with his wife; he knew that the victim was pregnant with his child, and the victim had threatened to reveal her pregnancy. Thus, the evidence tended to show a possible motive defendant had for killing the victim.

Further, the evidence shows that the victim withdrew from defendant before defendant stabbed her. Once defendant followed the victim down the road, defendant had to return to his car and retrieve the knife from the trunk before he pursued the victim down the road again and stabbed her in the back. This evidence shows that any provocation resulting from the argument between Naomi and defendant had had time to dissipate before defendant stabbed and killed her. We found similar evidence in *Watson* insufficient provocation to negate deliberation as a matter of law. 338 N.C. at 177-78, 449 S.E.2d at 700. Thus, under the specific facts of this case, the victim's actions, regardless of her mental condition, did not constitute sufficient provocation to negate premeditation and deliberation on the part of defendant.

Further, the State presented substantial evidence to support the inference that defendant committed the murder with premeditation and deliberation. Defendant's conduct before and after the killing showed that defendant met the victim at the grocery store with the murder weapon in the trunk of his car; that defendant then drove the victim to an area near the Haw River where he stabbed her in the back and disposed of her body; and that after disposing of the body, defendant returned home, cleaned off the murder weapon, and placed

the murder weapon back in his cupboard with the set of knives "it came from." We found similar facts to be evidence of premeditation and deliberation in *State v. Sierra*, 335 N.C. 753, 759, 440 S.E.2d 791, 795 (1994).

The nature and number of the victim's wounds and evidence that the killing was done in a brutal manner also tended to prove premeditation and deliberation. The State's evidence tended to show that after defendant stabbed the victim in the back, she fell to the ground and called defendant's name. Defendant continued to stab the victim while she lay helpless on the ground. The autopsy revealed defendant stabbed the victim a total of thirteen times. Defendant stabbed the victim at least twice in both the chest and abdominal areas. This evidence also supports a finding that defendant killed the victim with premeditation and deliberation. *See State v. Ginyard*, 334 N.C. 155, 159, 431 S.E.2d 11, 13 (1993) (evidence deceased suffered four stab wounds, including wounds to his upper and lower abdomen which pierced his heart and severed his rib, was evidence tending to prove premeditation and deliberation); *accord Fisher*, 318 N.C. at 518, 350 S.E.2d at 338 (evidence of multiple stab wounds, including two wounds to the chest, was evidence that the killing was done in a brutal manner to support a finding of premeditation and deliberation).

Thus, because we have concluded that defendant's version of the events surrounding the murder and the murder itself failed to establish provocation sufficient to negate defendant's premeditation and deliberation, regardless of the victim's mental condition at this time, testimony concerning the victim's mental condition would have been irrelevant to any fact in issue. Accordingly, we conclude that the trial court properly excluded such evidence.

[2] Defendant also argues, however, that the trial court erred in excluding testimony by defendant's neighbor, Rose Marie Gregory, that he told her that he tried to break off his relationship with Naomi but she would not let him, that he was reconciling with his wife, and that Naomi had threatened to tell defendant's wife she was pregnant. Assuming *arguendo* that this evidence was relevant to any theory of defendant's case, any error in not admitting this evidence was harmless. Similar testimony concerning these facts was before the jury, and these facts were undisputed. Thus, the tendered testimony would have been merely cumulative, and any error in failing to admit it was harmless. *See State v. Lovin*, 339 N.C. 695, 712, 454 S.E.2d 229, 239 (1995). Defendant's first assignment of error is overruled.

## II.

[3] Next, defendant contends that the trial court erred in refusing to rule on defendant's motion to prohibit the State from cross-examining his former wife, Vanessa Poteat, about defendant's prior assaultive conduct toward her. We disagree.

Following a *voir dire* hearing on the admissibility of Rose Marie Gregory's testimony held during defendant's presentation of his evidence, defendant suggested that a *voir dire* be held for Vanessa Poteat's testimony. During this *voir dire*, defendant asked Poteat about Naomi's harassing conduct toward her and defendant. The State then cross-examined Poteat on *voir dire* about defendant's previous assaults against her, including an assault when she was eight months pregnant. At the end of this *voir dire*, defendant argued that Poteat's testimony regarding Naomi was admissible but that any questions concerning the assaults by defendant on Poteat were "clearly not admissible."

The trial court stated:

Well, from what I heard on y'all's direct examination of this witness, I didn't—it's all admissible, based on what I've already heard about the case, I think, but I'm not going to rule on it. I'm not here to rule on the cross[-]examination by the State. I'm not going to make a ruling right now on that.

The trial court then ruled that the testimony elicited by defendant on direct was admissible.

Later in the trial, defendant asked the court to "give a ruling on whether or not [the State] is going to be allowed to ask these questions." The trial judge informed defendant that he had "already ruled on what [they] put [Poteat] up there about" and stated that he would listen to the cross-examination and make rulings as the trial proceeded. Thereafter, in response to the trial court's statement to defendant that the admissibility of the cross-examination was not properly before it, counsel for the defense stated, "I've made the motion that you consider it, and I guess you've denied my motion." Defendant did not call Poteat to testify.

Although defendant's motion was not made as a pretrial motion, his motion appears to be in the nature of a motion *in limine*, to exclude anticipated prejudicial evidence before such evidence is actually offered in the hearing of the jury. The decision of whether to

grant such a motion rests in the sound discretion of the trial judge. *See State v. Ruof*, 296 N.C. 623, 252 S.E.2d 720 (1979). "These motions can be made in order to prevent the jury from ever hearing the potentially prejudicial evidence thus obviating the necessity for an instruction during trial to disregard that evidence if it comes in and is prejudicial." *State v. Tate*, 300 N.C. 180, 182, 265 S.E.2d 223, 225 (1980). Such a motion is used "to prohibit opposing counsel from referring to or offering evidence on matters so highly prejudicial to [the] moving party that curative instructions cannot prevent predispositional effect on [the] jury." *Black's Law Dictionary* 1013 (6th ed. 1990).

In the present case, because we cannot say that the State would have offered evidence "so highly prejudicial" that a curative instruction would not have prevented prejudice from any improper questions, we conclude that the trial court did not abuse its discretion in failing to grant defendant's motion, thereby requiring defendant to object to Poteat's testimony had she testified. Defendant was free to call Poteat as a witness and retained the right to object to any questions asked by the State on cross-examination. Defendant's decision not to call Poteat as a witness was purely a tactical decision which did not implicate any of defendant's constitutional rights.

Defendant argues, however, that based on the holding in *State v. Lamb*, 321 N.C. 633, 365 S.E.2d 600 (1988), the trial court's failure to rule on his motion to prohibit the State's cross-examination of Poteat impermissibly chilled his right to present evidence and denied him his constitutional rights to a fair trial and due process of law. Defendant's reliance on *Lamb* is misplaced.

Unlike the present case, *Lamb* involved the defendant's right to testify on her own behalf. In *Lamb*, we held that the "bald denial" of defendant's motion *in limine* to exclude statements that "appeared inadmissible under Rule 608(b)" could "impermissibly chill" defendant's constitutional right to testify if it were "abundantly clear from the record . . . that defendant intended to testify unless her motion *in limine* was denied." *Id.* at 648-49, 365 S.E.2d at 608-09. The present case does not implicate defendant's right to testify on his own behalf, and the statements by the State were not necessarily inadmissible. *See State v. White*, 340 N.C. 264, 288, 457 S.E.2d 841, 855 (1995) (Although "other crimes" evidence did not appear to be admissible under N.C.G.S. § 8C-1, Rule 608(b), "the trial court could not know if defendant would 'open the door' to cross-examination about [this evi-

dence] until defendant testified."). Defendant's second assignment of error is overruled.

## III.

[4] Finally, defendant contends that the trial court erred in failing to ask sitting jurors if they saw or read an article containing allegedly prejudicial matters not in evidence that appeared in a local newspaper during the trial. We disagree.

Prior to the State resting its case, the court took a weekend recess. Before dismissing the jury for this recess, the trial court instructed the jurors not to discuss the case among themselves, or with anybody, or to allow anybody to approach them and discuss the case. Further, the trial court instructed the jurors not to "read anything that might be printed in the newspaper or listen to anything on the radio or [television] that might be disseminated about [the case]."

Over this weekend break, an article appeared in the Saturday edition of the local newspaper stating that defendant had previously been convicted of the first-degree murder of Naomi and sentenced to the death penalty. When the trial resumed on Monday, out of the presence of the jury, counsel for the defense presented this article to the court and asked the judge to "instruct the [jurors] that, as [he] told them, they weren't suppose [sic] to read the paper, consider anything about it, and did anybody read anything about it, and is that going to affect their ability to be impartial in the case."

In response to defense counsel's request, the judge stated that he had told each member of the jury numerous times not to read anything about the case and to decide the case on what he or she saw and heard admitted into evidence in open court. The court stated:

> THE COURT: I told it to each one at the time they were selected, [not to read anything about the case and to decide the case on what he or she saw and heard admitted into evidence in open court,] and I told it to them in detail at the time we took our break after they were—before they were impaneled, and I reminded them of it . . . Friday evening before they left, and I have to take it that they'll agree with it, and, as I said, I don't know how else to do it. I don't have the authority to shut that newspaper down, or tell them not to print stuff, and I have to take it that the jury is adhering to my instructions. So, I just don't think I need to go into it.

. . . .

THE COURT: I've seen too much reference to it, and they get curious and start looking and saying, "What's he so worried about? Let's go find it," you know. I've seen it back fire [sic] on you.

. . . .

THE COURT: . . . I'm not going to ask them about it. I believe they've been warned enough, and I believe they're a responsible jury. In fact, we heard one that came in here, somebody said they tried to talk to him and he said, "No, the judge told me not to talk about it," and wouldn't talk about it.

Thereafter, the trial resumed.

On appeal, defendant contends that the trial court's failure to question the jury regarding this newspaper article amounted to prejudicial error entitling him to a new trial. We disagree.

"When there is a substantial reason to fear that the jury has become aware of improper and prejudicial matters, the trial court must question the jury as to whether such exposure has occurred and, if so, whether the exposure was prejudicial." *State v. Barts*, 316 N.C. 666, 683, 343 S.E.2d 828, 839 (1986). No inquiry was conducted by the trial court in the present case. Based on the specific facts of this case, however, we conclude that the mere presentation of this particular newspaper article did not give rise to a "substantial reason to fear" that the jury had become aware of improper and prejudicial matters and disobeyed the judge's instructions.

Jurors are presumed to follow the instructions given by the trial court. *See State v. Rouse*, 339 N.C. 59, 451 S.E.2d 543 (1994), *reconsideration denied*, 339 N.C. 619, 453 S.E.2d 188 (1995), *petition for cert. filed*, —— U.S.L.W. —— (No. 94-9360, 19 May 1995). In the present case, the judge found that this jury panel was responsible and would follow his instructions. Based on the court's myriad experience with conducting inquiries into potentially prejudicial matters concerning the jury and the fact that the trial judge is in the best position to observe the jury, we give great weight to this finding by the trial judge. In addition, the judge's finding was supported by the fact that at least one member of the jury openly indicated that he had followed the court's instructions by refusing to talk about the case.

Accordingly, we find that defendant received a fair trial free from prejudicial error.

NO ERROR.