STATE OF NORTH CAROLINA v. KIMBERLY BRAXTON FRITSCH AKA
KIMBERLY RAINS FRITSCH

No. COA97-1382

(Filed 16 February 1999)

**1. Evidence— felonious child abuse and involuntary manslaughter—admissible—complaints of abuse—injuries—admissible**

The trial court did not abuse its discretion in a prosecution for felonious child abuse and involuntary manslaughter by denying defendant's motions in limine and allowing introduction of evidence pertaining to complaints of abuse or neglect of the victim by defendant and evidence pertaining to injuries suffered by the victim, including diaper rash, bedsores, unclean or sanitary appearance, and insect bites.

**2. Evidence— relevance—prejudicial impact—child abuse—victim's condition worse than other children**

The trial court did not err in a prosecution for felonious child abuse and involuntary manslaughter by allowing the State to present the testimony of a teacher, two social workers, and the director of a facility for children with disabilities that they had witnessed children with the victim's condition before but had never seen anyone in such poor condition as this victim.

**3. Evidence— photographs—autopsy—child abuse victim**

The trial court did not err in a prosecution for felonious child abuse and involuntary manslaughter by admitting autopsy photographs which, although grotesque, were used to illustrate the assertion of the pathologist that the victim was extremely malnourished. The photographs were relevant and not cumulative.

**4. Homicide; Child Abuse and Neglect— manslaughter and child abuse—malnourishment—evidence insufficient**

The trial court erred in a prosecution for involuntary manslaughter and felonious child abuse by denying defendant's motions to dismiss where defendant was convicted of misdemeanor child abuse and involuntary manslaughter. The State's evidence failed to demonstrate that defendant willfully or through culpable negligence deprived the victim of food and nourishment or that the victim's death was proximately caused by defendant's actions or inaction.

**STATE v. FRITSCH**

[132 N.C. App. 262 (1999)]

Appeal by defendant from judgment entered 26 March 1997 by Judge W. Allen Cobb, Jr. in Carteret County Superior Court. Heard in the Court of Appeals 17 September 1998.

*Attorney General Michael F. Easley, by Assistant Attorney General Grady L. Balentine, for the State.*

*Wheatly, Wheatly, Nobles & Weeks, P.A., by Stephen M. Valentine, for defendant-appellant.*

HUNTER, Judge.

Defendant was indicted for the felonious child abuse and involuntary manslaughter of her seven-year-old minor daughter (the victim), who died on 1 January 1996 at her home in Carteret County, North Carolina. Following a jury trial, defendant was convicted of misdemeanor child abuse and involuntary manslaughter and sentenced within the presumptive range provided for by the Structured Sentencing Act of sixteen to twenty months imprisonment.

Prior to trial, defendant filed five separate motions *in limine* seeking to exclude certain evidence from being introduced by the State, including (1) testimony that the victim's malnutrition was caused by defendant withholding food from the victim; (2) testimony regarding defendant's lifestyle; (3) testimony regarding injury to defendant's other child; (4) testimony regarding investigations of child abuse and neglect by defendant against the victim made by the Carteret County Department of Social Services (DSS); and, (5) testimony concerning certain injuries or conditions suffered by the victim, including diaper rash, bed sores, unclean or unsanitary appearance, and insect bites. Following arguments by counsel, the trial court allowed defendant's first three motions *in limine*, but denied the remaining two.

The evidence at trial tended to show defendant was the mother of the victim, who was born on 15 July 1988. From the time of her birth until sometime in 1992, the victim's pediatrician was Dr. William Stanley Rule. According to Dr. Rule, as a result of her premature birth, the victim suffered from numerous problems, including a swollen left kidney that did not function, urinary tract infections, pulmonary problems, hearing loss and visual problems. In addition, the victim had a severe case of cerebral palsy accompanied by mental retardation. As a result of these medical problems, the victim had never learned to talk or move around on her own. Her mental age

never exceeded that of an infant. She could not chew her own food and had substantial difficulty getting food into her body. At no time during her lifetime did she weigh more than twenty-seven pounds.

From June 1989 until January 1992, and then again from April 1993 until shortly before her death in January 1996, the victim was enrolled in the Newport Developmental Center (the Newport Center), a facility which provides schooling for children with disabilities. In September 1994, in response to a complaint filed by the Newport Center alleging improper care by defendant, DSS requested that Dr. Rule perform a child medical evaluation of the victim in order to determine whether there were any signs of abuse or neglect. Specifically, DSS asked Dr. Rule to determine whether the victim was receiving proper care and nourishment, and whether certain pressure sores on her body were normal for someone with her disability or if they indicated a problem of abuse or neglect. In response to this request, Dr. Rule examined the victim on 2 September 1994. At that time, defendant reported the victim was not suffering from any acute problems and was eating well. Dr. Rule then noted that the victim's development, intellectual performance and communication skills were below that of a normal six-year-old girl. Furthermore, he observed several instances of skin irritation, including a diaper rash, lesions and pressure ulcers. Dr. Rule then concluded by stating:

> The pressure [ulcer] and evidence of prior similar lesions, along with [the] chronic diaper rash . . . possible sign[s] of caloric intake, [and] apparent lack of consistent medical, home and medical follow-up of problems, all raise valid concerns regarding the child's care . . . . Cerebral palsy could possibly explain the child's size and growth status, but I still believe the situation is suspect. . . . The skin lesions and her diaper rash . . . I felt were indicative of . . . poor care. I thought that the weight of the child was something that should raise concern.

As a result of its investigation, DSS substantiated this allegation of neglect and prepared an intervention plan in order to help defendant remedy the victim's condition. This intervention plan included having regular weight-checks done of the victim; choosing a regular doctor that would treat the victim on a continuing basis; having the victim's progress monitored by a home health agency, or some other similar organization; having respite services available to the victim's family, which involved a person coming to the victim's home to help care for her so defendant and her family would have a break from the

**STATE v. FRITSCH**

[132 N.C. App. 262 (1999)]

pressures of caring for a disabled child; having the victim attend the Newport Center on a regular basis; and, having defendant obtain a regular job and become independent. DSS' involvement with this substantiated complaint of neglect ended in May 1995.

Thereafter, in October 1995, DSS received another complaint of neglect from the Newport Center, specifically referring to pressure sores on the victim's body and the victim's low weight. DSS again investigated the complaint, and observed the victim to be extremely dirty and odoriferous, with crusted dirt between her toes and in various folds of her skin. Furthermore, the victim was emaciated, had pressure sores on various parts of her body, and had a bad case of diaper rash. In response to questioning by DSS, defendant stated that the areas on the victim's body resembling pressure sores were in fact ant bites and that she was treating the ant bites with a topical medication recommended by her doctor. DSS then scheduled a physical for the victim on 18 October 1995. When the victim arrived for her appointment, she was diagnosed with an ear infection and an upper respiratory infection, and was sent home after rescheduling her physical for 24 October 1995. However, defendant did not take the victim to her scheduled physical, and again missed a scheduled physical on 2 November 1995. After that date, DSS made several unsuccessful attempts to contact defendant about the victim's condition, and the need for defendant to have a physical examination of the victim completed. When DSS finally talked with defendant, she assured them she would make an appointment to have a physical examination of the victim done, and confirmed that the victim had not been enrolled at the Newport Center in several months. Thereafter, DSS substantiated the neglect complaint on 20 December 1995 on the grounds of lack of proper care and lack of proper medical care of the victim. DSS then scheduled a home visit after the holidays, but the victim died on 1 January 1996.

According to defendant, as a result of the victim's condition, she was only able to eat pureed food, which defendant prepared by pureeing the same food eaten by the rest of the family in a blender and serving to the victim in a baby bottle with a specially adapted nipple. Defendant contends the victim's emaciated condition was due to an eating disorder associated with her severe cerebral palsy and mental retardation, and not caused by any sort of neglect on her part. In support of this proposition, defendant presented the expert testimony of Dr. Richard Stevenson, a pediatrician specializing in the area of developmental disabilities in children. After reviewing the victim's

medical records, but without having ever examined the victim herself, Dr. Stevenson testified that:

> [The victim's] ability to eat was limited by the severity of her disability, so that she could only take in a certain number of calories. I think that she became malnourished and stay[ed] malnourished chronically. I think that malnutrition was then complicated by medical factors. Most importantly, I think her bed sores, and that the combination of medical nutrition and the bed sores, as well as intervening colds and other things like that, lead to a vicious circle of continued malnutrition, increased weakness and eventually, death.

Dr. Stevenson further testified that a study published in the *New England Journal of Medicine* revealed that forty-three percent of children suffering from similar combinations of disabilities as the victim die before reaching the age of five and seventy percent die before the age of ten.

An autopsy was performed on the victim's body on 2 January 1996 by Dr. John Leonard Almeida, Jr., a pathologist. In his opinion, the victim's death was due to "starvation malnutrition," and he found no evidence of a blockage or any other condition which would have prevented the victim from ingesting or digesting food. In fact, approximately one quart of food was found in the victim's stomach. Dr. Almeida concluded that the starvation malnutrition of the victim caused a distention of her stomach which compressed the thoracic cavity, making it difficult for her to breathe, and eventually led to her death.

Defendant moved to dismiss the charges at the close of the State's evidence and again at the close of all the evidence. Both motions were denied by the trial court. The jury then returned a verdict finding defendant guilty of misdemeanor child abuse and involuntary manslaughter, and defendant moved to have the verdict set aside. The trial court denied this motion, and defendant was sentenced to sixteen to twenty months imprisonment.

I.

[1] Defendant's first two assignments of error relate to the trial court's denial of certain motions *in limine* concerning (1) the introduction of evidence pertaining to complaints of abuse or neglect of the victim by defendant which were substantiated by DSS in 1994 and 1995, and (2) the introduction of evidence pertaining to certain

injuries suffered by the victim, including diaper rash, bed sores, unclean or unsanitary appearance, and insect bites.

A ruling on a motion *in limine* is within the sound discretion of the trial court, and will not be disturbed on appeal absent a manifest abuse of discretion. *State v. Hightower*, 340 N.C. 735, 746-47, 459 S.E.2d 739, 745 (1995). Furthermore, past incidents of mistreatment are admissible to show intent in child abuse cases. *State v. West*, 103 N.C. App. 1, 9-11, 404 S.E.2d 191, 197-98 (1991). Here, the State argues that this evidence was admitted not to show defendant's propensity to commit the crime, but rather to show that she had knowledge of the degree of care that was expected towards the victim but failed to follow recommendations made by DSS. After careful review, we find that the trial court did not abuse its discretion in denying defendant's motions *in limine* and allowing the introduction of this evidence.

## II.

**[2]** Next, defendant contends the trial court committed prejudicial error by overruling her objections to certain testimony that the victim's physical condition appeared worse than the condition of other children. Specifically, the State was permitted, over defendant's objections, to present the testimony of Doris Oglesby, the director of the Newport Center; Ruth Varner, a teacher at the Newport Center; Pam Stewart, a DSS social worker; and, Dan Sullivan, a DSS social worker. Each of these witnesses testified they had witnessed children with the victim's condition before but had never seen someone in such a poor condition as the victim. Without citing any case authority for her proposition, defendant essentially contends this testimony was highly prejudicial and should have been excluded under Rule 403.

The decision of whether to exclude relevant evidence under Rule 403 for its prejudicial effect is a matter within the sound discretion of the trial court. *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). Here, the trial court determined that the evidence was relevant to show defendant had not provided adequate care to the victim, and found that its probative value outweighed any prejudicial effect. After careful review, we find the trial court did not abuse its discretion by admitting this testimony.

## III.

**[3]** Next, defendant contends the trial court erred by allowing the State to introduce seven autopsy photographs which are described by

defendant as "utterly grotesque and horrible." Defendant contends these photographs were cumulative, and were introduced solely for the purpose of inflaming the jury.

The photographs at issue were introduced by the State during the direct examination of Dr. Almeida, the pathologist who performed the autopsy of the victim, and were used to illustrate Dr. Almeida's assertion that the victim was extremely malnourished. As our Supreme Court has held, even "gory, gruesome, horrible, or revolting" photographs are admissible so long as they are used to illustrate the testimony of a witness and are not excessive or repetitive. *State v. Phillips*, 328 N.C. 1, 15, 399 S.E.2d 293, 300, *cert. denied*, 501 U.S. 1208, 115 L. Ed. 2d 977 (1991). After careful review, we find that these photographs, although admittedly grotesque in nature, were relevant, not cumulative, and, therefore, properly admitted.

IV.

[4] Finally, defendant contends the trial court erred by not granting her motions to dismiss the charges at the close of the State's evidence and at the close of all the evidence on the basis that there was insufficient evidence of the crimes charged. In considering a motion to dismiss based on insufficient evidence, the question for the trial court to consider is "whether there is substantial evidence of each element of the crime charged and of the defendant's perpetration of such crime." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983). The evidence must be considered in the light most favorable to the State, and the State is entitled to every reasonable inference. *State v. Robbins*, 309 N.C. 771, 775, 309 S.E.2d 188, 190 (1983). Furthermore, the issue of whether the State has presented substantial evidence of the crime charged is a question of law for the trial court. *State v. Earnhardt*, 307 N.C. 62, 66, 296 S.E.2d 649, 652 (1982). "The trial court's function is to determine whether the evidence allows a *'reasonable inference'* to be drawn as to the defendant's guilt of the crimes charged." *Id.* at 67, 296 S.E.2d at 652 (emphasis in original).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Scott*, 323 N.C. 350, 353, 372 S.E.2d 572, 575 (1988). However, if the evidence is sufficient to raise only a suspicion or conjecture about whether the accused committed the alleged crime, the motion should be allowed, even if the suspicion of defendant's guilt is strong. *State v. Earnhardt*, 307 N.C. at 66, 296 S.E.2d at 652.

STATE v. FRITSCH

[132 N.C. App. 262 (1999)]

In this case, defendant was indicted for felonious child abuse and involuntary manslaughter. Following its deliberations, the jury returned verdicts of guilty of misdemeanor child abuse and involuntary manslaughter. Therefore, we must determine whether the State's evidence was sufficient to submit these issues to the jury.

Before addressing the details of this case, it is helpful to discuss how some courts have handled similar cases dealing with criminal charges being brought against parents for the starvation or malnutrition of their children. In general, it has been stated that:

> [I]n order that a person who withholds food, clothing, or shelter from another may be found criminally liable under general statutes defining murder or manslaughter, it must be shown that (1) such person owed a duty to furnish food, clothing, or shelter; (2) the conduct of such person in not furnishing food, clothing, or shelter was wilful or done with malicious intent, or constituted culpable negligence; and (3) the lack of food, clothing, or shelter was the proximate cause of, or a cause contributing proximately to, the death. A number of cases support the view that ordinarily, there is a case of murder where death is the direct consequence of a wilful and malicious omission of a parent to feed his or her child, but that if the omission is not wilful, and arises out of neglect only, it is manslaughter.

John D. Perovich, J.D., Annotation, *Homicide by Withholding Food, Clothing, or Shelter*, 61 A.L.R.3d 1207, 1209-1211 (1975) (citations omitted). As we will discuss, we believe that the last two elements—those dealing with the criminal culpability of the defendant and the proximate cause of the victim's death—have not been met in this case, and therefore the trial court erred in denying defendant's motions to dismiss.

As previously stated, defendant was indicted for felonious child abuse and involuntary manslaughter, and convicted of misdemeanor child abuse and involuntary manslaughter. Upon review, we must determine whether the State presented substantial evidence of each element of the crimes charged sufficient to defeat defendant's motions to dismiss. In order to sustain a charge for felonious child abuse pursuant to N.C. Gen. Stat. § 14-318.4, the State is required to present substantial evidence that the defendant is:

> (a) [1] A parent or any other person providing care to or supervision [2] of a child less than 16 years of age [3] who intentionally inflicts any serious physical injury upon or to the child or who

intentionally commits an assault upon the child which results in any serious physical injury to the child . . . .

N.C. Gen. Stat. § 14-318.4(a) (1993). The State's burden of proof is a little less severe to sustain a charge of misdemeanor child abuse under N.C. Gen. Stat. § 14-318.2, which requires a showing by substantial evidence that the defendant is:

> (a) [1] [A] parent [2] of a child less than 16 years of age, or any other person providing care to or supervision of such child, [3] who inflicts physical injury, or who allows physical injury to be inflicted, or who creates or allows to be created a substantial risk of physical injury, upon or to such child by other than accidental means . . . .

N.C. Gen. Stat. § 14-318.2(a) (Supp. 1997). Furthermore, in order to support a charge of involuntary manslaughter pursuant to N.C. Gen. Stat. § 14-18, the State must show by substantial evidence that the defendant committed:

> [An] "unintentional killing of a human being without malice, proximately caused by (1) an unlawful act not amounting to a felony nor naturally dangerous to human life, or (2) a culpably negligent act or omission."

*State v. Wingard*, 317 N.C. 590, 600, 346 S.E.2d 638, 645 (1986).

As previously noted, it is generally understood that in cases involving starvation or malnutrition of children by their parents or guardians, three elements must exist: (1) the defendant must have a duty to adequately feed and nourish the child; (2) the defendant must refuse to feed and nourish the child, either wilfully or by his/her culpable negligence; and, (3) the defendant's actions, or inactions, must proximately result in the child's death. *See* Perovich, *supra*, at 1209-1211; *see also Bliley v. State*, 160 So. 2d 507, 508-509 (1964).

In *State v. Mason*, 18 N.C. App. 433, 197 S.E.2d 79, *cert. denied*, 283 N.C. 669, 197 S.E.2d 878 (1973), the only other North Carolina case concerning a conviction for involuntary manslaughter for the starvation death of a child, the decedent child was found in extremely squalid living conditions and the autopsy revealed findings consistent with starvation. The stomach and proximal intestine contained no food and there was no evidence of any other significant disease. Other evidence introduced at trial indicated a pattern by the defendants of failing to properly provide food, care and medical attention to the victim.

**STATE v. FRITSCH**

[132 N.C. App. 262 (1999)]

In the present case, the decedent child lived in a properly heated, well stocked home with several healthy, well-fed children. The autopsy revealed approximately one quart of food in the child's stomach and there was evidence of several significant medical conditions (i.e. non-functioning kidney, brain atrophy). Additional evidence presented at trial tended to show that, although she was not always timely about her visits to the doctor, defendant had last taken the victim in for a physical examination on 18 October 1995 and that the physician expressed no alarm at the child's condition. In fact, there is no evidence that any of the treating or examining physicians ever recommended hospitalization or feeding the victim through the insertion of a gastrostomy tube. Friends and family members testified they were in contact with defendant and the victim up until the day of the victim's death, and at no point were they overly concerned with the victim's well being. Defendant fed the child the day before she died leaving no evidence linking malnutrition to denial of food to the victim by defendant.

After careful review, we find the State has failed to present substantial evidence of either felonious or misdemeanor child abuse, or of involuntary manslaughter. The State's evidence fails to demonstrate that defendant wilfully, or through her culpable negligence, deprived the victim of food and nourishment. Furthermore, the State failed to present substantial evidence that the victim's death was proximately caused by defendant's actions, or inaction. At best, the State's evidence raised a suspicion that defendant did not adequately feed and nourish the victim, but that does not rise to the level of substantial evidence required to submit the case to the jury. *See Bliley* at 509 (where the Alabama Supreme Court, in reviewing the mother's manslaughter conviction of death by malnutrition, held that neglect must be established as the immediate cause of death and that there be positive proof of withholding sufficient food to maintain life). As such, the trial court erred in denying defendant's motions to dismiss the charges made at the close of the State's evidence and at the close of all the evidence.

Reversed.

Judges WYNN and McGEE concur.

Judge Wynn concurred in the result of this opinion prior to 1 October 1998.