STATE v. BRITT

[217 N.C. App. 309 (2011)]

STATE OF NORTH CAROLINA v. MYRON KEITH BRITT

No. COA11-311

(Filed 6 December 2011)

## 1. Evidence—expert testimony—reversal of ruling on motion in limine—firearm toolmark identification

The trial court did not abuse its discretion in a first-degree murder case by reversing its ruling on a motion in *limine* that limited the expert testimony of two agents about firearm toolmark identification. The trial court evaluated the evidence prior to trial and found the experts' methodology sufficiently reliable and the experts better qualified than the jury to form an opinion.

## 2. Constitutional Law—effective assistance of counsel—statements opened door to additional evidence

Defendant did not receive ineffective assistance of counsel in a first-degree murder case based on his attorney's statements which opened the door to the admission of testimony of two agents that the two bullets were fired from the same gun. Defense counsel's words created an impression that the bullets did not come from the same gun. Further, defense counsel conducted a zealous cross-examination of the State's experts.

## 3. Evidence—prior crimes or bad acts—financial hardships and misconduct—false loan application information—altering tax returns—motive

The trial court did not err in a first-degree murder case by admitting several pieces of evidence relating to defendant's financial hardships and misconduct in the years preceding his wife's murder. Defendant's actions in submitting false information in a loan application and altering tax returns were relevant to show motive.

## 4. Evidence—letter—financial hardships—motive to kill

The trial court did not abuse its discretion in a first-degree murder case by admitting into evidence a letter defendant wrote to an acquaintance, written years before his wife's death, which detailed his financial hardships. The statements in the letter, viewed in conjunction with other evidence, supported the State's theory that defendant had a financial motive to kill his wife.

STATE v. BRITT

[217 N.C. App. 309 (2011)]

Appeal by defendant from judgment entered 30 July 2009 by Judge Gregory A. Weeks in Robeson County Superior Court. Heard in the Court of Appeals 7 November 2011.

*Roy Cooper, Attorney General, by John G. Barnwell, Assistant Attorney General, and Robert C. Montgomery, Special Deputy Attorney General, for the State.*

*David L. Neal, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant appeals from a judgment entered upon a jury verdict finding him guilty of the first-degree murder of his wife, Nancy Melton Britt, and sentencing him to life imprisonment without parole. We find no error in his trial.

The evidence at trial tended to show that defendant and Nancy Britt were married in 1976, and lived in Lumberton until 1992 when they moved to Cary. Nancy Britt was a teacher and defendant was a licensed contractor who had his own business, Britt Home Builders. Nancy Britt had two sisters who lived in Lumberton, Judy Ivey and Donna Madrey. Donna Madrey was severely disabled, requiring full-time care, due to an aneurysm and stroke suffered at some time in the past; Judy Ivey was her caretaker. On the evening of 22 August 2003, Nancy Britt drove to Lumberton to care for Ms. Madrey while Ms. Ivey traveled out of town for the weekend. Nancy Britt arrived at about 6:50 p.m. and Ms. Ivey left shortly thereafter. Ms. Ivey spoke by telephone with Nancy Britt about 10:00 p.m. that evening.

Sometime after 3:00 a.m. on 23 August 2003, Lumberton 911 received a call from Ms. Ivey's residence; the caller was unable to communicate. Lumberton Police officers responded and found the rear entrance open, heard Ms. Madrey inside saying "help, hurt, help, hurt," and then discovered Nancy Britt's body lying in a hallway. She had been shot one time in the upper right abdomen. The officers found a single, spent .25 caliber shell casing on the floor of the bedroom in which Nancy Britt was staying. The officers found no evidence of forced entry and the contents of the house did not appear to have been disturbed. Nancy Britt was still wearing her jewelry; her pocketbook and cell phone were still in the bedroom. Ms. Madrey was unable to provide any information as to what had happened. At autopsy, a .25 caliber Winchester expanding metal point bullet and fragment were recovered from Nancy Britt's body.

The State also produced evidence that defendant had borrowed a .25 caliber semi-automatic pistol from his brother, Dickie Britt, approximately five weeks before Nancy Britt's death. After Nancy Britt's death, Dickie Britt called defendant and asked about the gun. Defendant told Dickie that the gun "was in a safe place" and, when Dickie suggested he turn it over to law enforcement to exonerate himself, defendant said "he would have to think about it." Dickie Britt then told law enforcement officers about the gun and related an incident which had occurred about two years previously when the gun had accidentally discharged at their mother's home and the bullet had lodged in a baseboard. The bullet, a .25 caliber Hornady, jacketed, hollow point bullet, was recovered from the baseboard by agents of the State Bureau of Investigation and Lumberton police officers.

When he was interviewed initially by law enforcement officers shortly after Nancy Britt's death, defendant denied that either he or Nancy had a gun or had ever had a gun in their house; he also denied that he had any financial problems. After receiving the information about the gun from Dickie Britt, Agent Trent Bullard of the State Bureau of Investigation again interviewed defendant. Defendant again denied having a gun, but when confronted with his brother's statement, defendant admitted having gotten the gun from Dickie, but told Agent Bullard that he had thrown it in Jordan Lake the very next day after getting it from Dickie. Scuba divers searched the area of the lake in which defendant said he had thrown the gun, but found no firearms. A live, unfired .25 caliber Winchester expanding metal point cartridge was found under the driver's seat of defendant's automobile during a search by S.B.I. agents on 4 September 2003.

S.B.I. Agents Theresa Tanner and Peter Ware, both of whom were permitted to testify as expert witnesses in forensic firearms identification, conducted independent examinations of the bullet taken from Nancy Britt's body and the bullet taken from the baseboard of defendant's mother's house. Based upon the lands and grooves in each bullet, as well as individual microscopic striations and marks present on both of them, both agents reached independent opinions that the bullets had been fired by the same firearm.

The State also offered evidence tending to show that as early as 1998 or 1999, defendant experienced financial difficulties and, around that time, wrote a letter to an acquaintance regarding his substantial financial losses in the stock market and his dire personal financial situation. There was also evidence tending to show that defendant submitted altered federal and state income tax returns for the Britts' per-

sonal taxes and those of his company to BB&T in connection with an application for a loan in December 2002, which substantially increased the mortgage indebtedness on their home. Defendant also took out life insurance policies on Nancy's life totaling $815,000, including a $325,000 policy in 1998, and a $400,000 policy in May 2003, less than four months before her death. Defendant was the named beneficiary of each of the policies.

Defendant offered evidence through a financial analyst that Britt Home Builders was a viable business which earned a profit in all but two years of its existence. Through Nancy's teaching income and defendant's draws from the business, the couple had sufficient income to meet their obligations, enjoyed good credit, and had $34,000 in the bank and $200,000 equity in their home. He also offered evidence tending to show that he and Nancy had a good marriage and seemed happy; no one who testified had noticed anything out of the ordinary during the summer of 2003.

On the night of 22 August, the Britts' daughter had driven defendant's automobile to babysit and returned home about 11:00 p.m. When she arrived, defendant was watching television; she went to bed and did not hear the garage door open or her father leave after that. The teenage daughter of the Britts' next door neighbor was hosting a sleepover that night; she and her guests were up most of the night in a room across from the Britt's garage. They did not hear the garage door open or close and did not see anyone come or go from the Britt residence.

Defendant also offered the testimony of John Dillon, a former chief of the F.B.I.'s firearms and toolmark unit, and William Conrad, a private consultant on firearms identification, both of whom were permitted to testify as experts in the field of firearms examination. Both witnesses testified that they examined the bullet removed from Nancy Britt's body, compared it to the bullet recovered from defendant's mother's home, and found there were insufficient microscopic points of comparison between the two bullets to conclude they had been fired from the same gun.

Prior to trial, defendant moved in limine to exclude Agent Tanner and Ware's firearm identification testimony. After a pretrial hearing, the trial court denied the motion, but stated that, in its discretion, it would limit any testimony by the State's witnesses to statements that the bullets were "consistent," rather than that they had been fired from the same weapon to the exclusion of all others. At trial, however, after defense counsel stated in his opening statement that defend-

ant's experts would testify as to their "opinion that you cannot make a match, that there [are] simply not enough points of comparison on the two bullets," the trial court reversed its earlier ruling in limine and permitted the State's experts to testify to their opinions that both bullets were fired from the same gun.

---

On appeal, defendant contends the trial court improperly admitted (I) the expert testimony of S.B.I. Agents Tanner and Ware, and (II) evidence of defendant's financial situation. We disagree.

I.

[1] Defendant contends the trial court erred when he reversed his ruling on the motion in limine that limited the expert testimony of Agents Tanner and Ware. Defendant argues that the firearm identification procedures used by the agents were unreliable and they were unqualified to testify as expert witnesses.

A motion in limine seeks pretrial determination of the admissibility of evidence to be introduced at trial. *Hamilton v. Thomasville Med. Assocs., Inc.*, 187 N.C. App. 789, 792, 654 S.E.2d 708, 710 (2007). "The decision of whether to grant [a motion in limine] rests in the sound discretion of the trial judge." *State v. Hightower*, 340 N.C. 735, 746-47, 459 S.E.2d 739, 745 (1995). A trial court has discretion to determine whether to exclude evidence that could confuse or mislead the jury, and the "trial judge's ruling may be reversed for an abuse of discretion only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *State v. Rupe*, 109 N.C. App. 601, 612, 428 S.E.2d 480, 487 (1993). Before trial, the court made findings of fact which supported admitting, but limiting, the expert testimony of Agents Tanner and Ware. Although the court found the testimony sufficiently reliable and the experts qualified, it prohibited them from testifying the bullets were fired from the same weapon to the exclusion of all others. After defense counsel's opening statement, however, the court reversed its ruling, finding it would not be unfairly prejudicial or misleading for the two agents to state that the bullets were fired from the same weapon, in light of the projected testimony of the defense experts that there was insufficient evidence of a "match."

Reversing its ruling on the motion in limine was not an abuse of discretion because the court evaluated the evidence prior to trial and found the experts' methodology sufficiently reliable and the experts qualified. To determine if proffered expert testimony is admissible

under North Carolina Rule of Evidence 702, a trial court must conduct a three-step inquiry to ascertain whether: (1) the expert's method of proof is reliable; (2) the witness presenting the evidence qualifies as an expert; and (3) the evidence is relevant. *State v. Morgan,* 359 N.C. 131, 160, 604 S.E.2d 886, 903-04 (2004). Here, defendant challenges only the first two prongs of this inquiry.

First, defendant argues forensic toolmark identification, in general, is unreliable. In assessing reliability of an offered method of proof, a trial court should review precedent "for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable." *Howerton v. Arai Helmet, Ltd.,* 358 N.C. 440, 459, 597 S.E.2d 674, 687 (2004). Once the trial court determines the expert's methods are sufficiently reliable, any doubt as to the "quality of the expert's conclusions go to the weight of the testimony rather than its admissibility." *Id.* at 461, 597 S.E.2d at 688. Courts in North Carolina have upheld the admission of expert testimony on firearm toolmark identification for decades. *See, e.g., State v. Felton,* 330 N.C. 619, 638, 412 S.E.2d 344, 356 (1992); *State v. Anderson,* 175 N.C. App. 444, 450, 624 S.E.2d 393, 398 (2006). Although not binding on this Court, a federal district court in Massachusetts recently revisited and closely examined the reliability of toolmark identification in *United States v. Monteiro,* 407 F. Supp. 2d 351, 372 (2006), and found the methodology reliable. Thus, the trial court's ruling that toolmark identification is sufficiently reliable was consistent with precedent and not manifestly unsupported by reason.

The court may deviate from precedent, however, if the defendant offers new evidence challenging the reliability of the methodology. *Howerton,* 358 N.C. at 460, 597 S.E.2d at 687. In the instant case, however, defendant did not introduce any "new" or "compelling" evidence to the trial court. *Id.* During the pretrial hearing, attorney for the State asserted, "[t]hey haven't presented any evidence regarding the unreliability of the firearm identification," to which the court responded, "I agree with you on that." The court noted that it had "read a lot of material [regarding firearm identification] because [it] knew this issue was coming up." The court, therefore, correctly followed precedent and admitted the expert testimony regarding toolmark analysis of ballistics.

Defendant further argues Agents Tanner and Ware were not qualified to testify as expert witnesses based on a lack of evidence verifying Agent Tanner's training and a shared lack of credentials. For an expert witness to offer opinion testimony, he must have "acquired

such skill through study or experience so as to make him better qualified than the jury to form an opinion on the subject matter." *State v. Alston*, 294 N.C. 577, 584, 243 S.E.2d 354, 360 (1978). "It is not necessary that an expert be experienced with the identical subject matter at issue or be a specialist, licensed, or even engaged in a specific profession." *State v. Evangelista*, 319 N.C. 152, 163-64, 353 S.E.2d 375, 383 (1987).

The State presented evidence of the qualifications and experience of S.B.I. Agents Tanner and Ware at the pretrial hearing. Although the State did not present verification of Agent Tanner's training, and neither Agent Tanner or Agent Ware were members of a professional organization, Agents Tanner and Ware explained how firearm toolmark identification works and how they conducted their investigations such that they were better qualified than the jury to form an opinion in the instant case. The trial court assessed all the evidence regarding the credentials and methodology of Agents Tanner and Ware and found them competent to testify as experts. Thus, the ruling was not manifestly unsupported by reason, and the trial court did not abuse its discretion by allowing Agents Tanner and Ware to testify.

[2] Defendant next contends that his attorney's statements, which "opened the door" to the admission of the testimony of Agents Tanner and Ware that the two bullets were fired from the same gun, amounted to ineffective assistance of counsel. To succeed in an ineffective assistance of counsel claim, defendant must first show counsel's performance was deficient, meaning that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the U.S. Constitution. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693 (1984); *State v. Braswell*, 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). Second, the defendant must show the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693.

In this case, defense counsel's use of the word "match" was not an attempt to mischaracterize defendant's evidence; rather, his words, when spoken to the jury, simply created an impression that the bullets did not come from the same gun. While this assertion allowed more persuasive expert testimony to be introduced, defense counsel conducted a zealous cross examination of the State's experts. Moreover, the court gave an amplified instruction to the jury, directing the jurors to consider the witness' training, qualifications, and experience or lack thereof, as well as the reasons given for their opinion and the facts that support their opinion, in determining how much

weight, if any, to give to the expert's testimony. Thus, counsel's statement was not so egregious as to render his performance deficient, depriving defendant of counsel as guaranteed by the Constitution. Because we find defendant has not shown counsel was deficient, we need not determine if defendant was prejudiced by his actions.

II.

[3] Defendant also assigns error to the court's admission of several pieces of evidence related to his financial hardships and misconduct in the years preceding his wife's murder.

Defendant first contends evidence of the false information submitted in his 2002 mortgage application was inadmissible character evidence and, relying on *State v. al-Bayyinah*, 356 N.C. 150, 154, 567 S.E.2d 120, 123 (2002), too far removed from Nancy's death in both character and temporal proximity to be relevant in this case. "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive . . . ." N.C. Gen. Stat. § 8C-1, Rule 404(b) (2009). Rule 404(b) is a "general rule of inclusion of relevant evidence of other crimes, wrongs or acts by a defendant, [applicable unless] its only probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *State v. Coffey*, 326 N.C. 268, 278-79, 389 S.E.2d 48, 54 (1990). Our Court has held "[we] review a trial court's determination to admit evidence under [Rule 404(b)] . . . for an abuse of discretion." *State v. Summers*, 177 N.C. App. 691, 697, 629 S.E.2d 902, 907, *appeal dismissed and disc. review denied*, 360 N.C. 653, 637 S.E.2d 192 (2006).

The trial court carefully examined the evidence, finding that defendant's action in submitting false information in the loan application was relevant to show motive, and admitted the evidence under North Carolina Rule of Evidence 404(b). Although seemingly unrelated, when viewed in conjunction with other evidence of the Britts' financial hardships, defendant's fraudulent conduct in altering his tax returns supported the State's theory that defendant had a financial motive to murder his wife which grew over a period of several years. The trial court gave a limiting instruction to the jury, instructing it to consider the evidence only for purpose of motive. Furthermore, the trial court suppressed evidence of defendant's previous conviction for unrelated larceny charges in 1999, concluding it was duplicative of evidence already admitted and more prejudicial than probative.

The court, therefore, properly exercised its discretion in admitting some 404(b) evidence and excluding other such evidence.

**[4]** Defendant next contends that a letter he wrote years before his wife's death to an acquaintance which detailed his financial hardships was more prejudicial than probative, and therefore, should not have been admitted into evidence. The court admitted the letter under Rule 401 and 403, and thus, its ruling will be given great deference on appeal. *State v. Wallace*, 104 N.C. App. 498, 502, 410 S.E.2d 226, 228 (1991). Relevant evidence is that which has any tendency, however slight, to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. N.C. Gen. Stat. § 8C-1, Rule 401 (2009); *State v. Freeman*, 313 N.C. 539, 546, 330 S.E.2d 465, 472 (1985). In criminal cases, every circumstance that is calculated to throw any light on the supposed crime is admissible. *State v. Hamilton*, 264 N.C. 277, 286-87, 141 S.E.2d 506, 513 (1965). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . or misleading the jury . . . ." N.C. Gen. Stat. § 8C-1, Rule 403 (2009). The jury is to determine the weight of such evidence. *Hamilton*, 264 N.C. at 287, 141 S.E.2d at 513.

The trial court admitted as relevant to a contested issue in the case: whether defendant's precarious financial situation, as detailed in the letter, motivated him to murder his wife. The court made a reasoned decision based on arguments from each party that the probative value of the evidence exceeded the prejudice to the defendant under Rule 403. In particular, the letter contained statements disclosing that defendant's wife was not aware of their financial problems, that he had very little money left in his trading account and for his son's college tuition, and that his business was encountering difficulty competing with national builders. These statements, viewed in conjunction with other evidence, support the State's theory that defendant had a financial motive to kill his wife. Thus, admitting the letter was not an abuse of discretion.

No Error.

Judges STROUD and ERVIN concur.