An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-6

Filed: 20 October 2015

Polk County, No. 11 CRS 50162

STATE OF NORTH CAROLINA

v.

TRAVIS LEE McGRAW

Appeal by defendant from judgment entered 4 June 2014 by Judge James T. Davis in Polk County Superior Court. Heard in the Court of Appeals 12 August 2015.

> *Roy Cooper, Attorney General, by Mary Carla Babb, Assistant Attorney General, for the State.*
>
> *Leslie Rawls for defendant-appellant.*

DAVIS, Judge.

Travis Lee McGraw ("Defendant") appeals from his conviction for first-degree murder. On appeal, he contends that the trial court abused its discretion by allowing an expert witness to offer an opinion on firearm identification to a degree of absolute certainty. After careful review, we conclude that Defendant received a fair trial free from error.

**Factual Background**

The State presented evidence at trial tending to establish the following facts: Defendant had been married to Vanessa Mintz ("Mintz") since 2009. During February of 2011, Mintz worked as the general manager of the Saluda Mountain Lodge ("the Lodge") in Saluda, North Carolina.

On 18 February 2011 at approximately 5:30 p.m., Mintz had a business dinner with Heidi Latham ("Latham") concerning a Cotillion franchise[1] that Mintz had recently purchased from Latham's company, the National League of Junior Cotillion. After dinner, Mintz and Latham drove to the Lodge where both were scheduled to stay for the night. When they arrived around 8:00 p.m., Latham noticed a red pickup truck parked in front of the Lodge's breezeway.

Upon entering the Lodge, Mintz and Latham met Defendant, who had arrived earlier that evening. Mintz, Latham, and Defendant spoke in the living room of the Lodge manager's apartment for some period of time before Defendant left to bring Mintz food and a drink from a store. About 15-20 minutes after Defendant left, Latham retired to her room for the night. On her way to her room, she observed that Defendant's pickup truck was no longer parked in front of the Lodge's breezeway.

In the early morning hours of 19 February 2011, Latham was awakened by what she described as two loud "whooshing" sounds, occurring slightly more than one minute apart. She tried to go back to sleep but was unsuccessful, and after 30-45

---

[1] Latham explained that Cotillion is "an etiquette program for 6th, 7th and 8th graders."

minutes she decided to leave the Lodge. As she walked outside to her car, she noticed the red pickup truck was once again parked in the same place where it had been the previous evening when she arrived at the Lodge.

At 9:00 a.m. on 19 February 2011, Mintz's daughter Jessica Freeman ("Freeman"), who worked at the Lodge with her mother, arrived at the Lodge. She noticed that the office blinds were drawn, the "closed" sign was still up in the office window, and the door to the office was open — all of which were unusual for that time of day. Freeman entered the manager's apartment and walked to the bedroom where she discovered Mintz, who was covered in blood and appeared to have been shot in the head.

Freeman called 911, and law enforcement officers and emergency medical personnel responded. Special Agent Shannon Ashe ("Agent Ashe") with the State Bureau of Investigation ("SBI") arrived at the Lodge at 11:50 a.m. and began investigating the scene. Upon inspecting the Lodge office, Agent Ashe observed that the cash drawer was open and empty but determined that there was no sign of any forced entry. Agent Ashe also recovered a spent Winchester 12-gauge shotgun shell on the floor of the bedroom where Mintz' body was discovered.

Defendant arrived at the Lodge sometime later that morning. He was cooperative with law enforcement officers and voluntarily consented to a search of his truck from which officers recovered several firearms, gun magazines, and

ammunition, including 12-gauge shotgun shells. Defendant voluntarily gave law enforcement officers additional firearms kept at his home, including a camouflage 12-gauge Mossberg model 500A shotgun ("the Mossberg").

An autopsy of Mintz' body revealed that she had suffered two shotgun wounds — one to her right arm and one to her head. Shotgun pellets along with shotgun shell wadding were recovered from both wounds.

On 25 July 2011, Defendant was indicted on the charge of first-degree murder. Prior to trial, on 8 January 2014, Defendant filed a "motion to prohibit State's expert from rendering [an] opinion on toolmark and firearm identification." In his motion, Defendant requested that the trial court limit the testimony of Special Agent Shane Greene ("Agent Greene"), a senior forensic firearm and toolmark examiner with the SBI, by prohibiting him from testifying "that a 'specific gun fired a specific [shell] to the exclusion of all other guns in the world.'" The trial court held a pretrial hearing on Defendant's motion and ultimately denied the motion without prejudice to Defendant's ability to raise the issue again at trial.

A jury trial was held in Polk County Superior Court on 19 May 2014 before the Honorable James T. Davis. At trial, Defendant again moved to limit the testimony of Agent Greene, who was qualified as an expert in forensic firearm and toolmark identification. A *voir dire* hearing took place concerning the permissible scope of his testimony. At the conclusion of the *voir dire* hearing, the trial court ruled that Agent

Greene would be permitted to testify that the Mossberg matched a shotgun shell recovered at the scene.[2]  Over Defendant's objection, Agent Greene testified before the jury that after test-firing three shells from Defendant's Mossberg and comparing them to the shell recovered at the scene of the crime,

> [i]t was my opinion that the Q-1, the questioned shotgun shell, and the T-11, which I test fired from the K-4, which was the Mossberg camouflage shotgun, matched . . . . So it was my opinion that the questioned shotgun shell, the one found from the crime scene, was fired in [sic] the camouflage Mossberg shotgun.

Agent Greene further testified that the pellets and shotgun shell wadding recovered from Mintz' wounds during her autopsy were most consistent with the type of wadding and pellets contained in 12-gauge Winchester shotgun shells.  He stated that he utilized the protocols established by the Association of Firearm and Tool Mark Examiners in conducting his comparison of the shell recovered at the scene to the Mossberg.  He further testified that his methodology and results had been peer reviewed and found to be satisfactory, explaining that "[b]asically, the evidence is looked [sic] by two examiners to make sure they reach the same conclusions."  Agent Greene also stated that he had performed "tens if not hundreds of thousands of individual comparisons" of firearms to "particular bullet[s] or cartridge case[s] or

---

[2] The trial court issued a written order memorializing its ruling on 30 May 2014.

- 5 -

shotgun shell[s]" and had testified as an expert in firearm identification in approximately 85 trials.

The State also introduced the testimony of Mary Beth Fisher ("Fisher"), who stated that she had been in a personal relationship with Defendant since January 2011. She explained that they engaged in "a lot of texting and talking over the phone" and had expressed their love to each other. Fisher stated that Defendant had initially told her he was single but that she later discovered he was actually married. When she confronted him on this subject, he responded that he and Mintz "faked a marriage and eloped, faked a marriage, came back, so that it would be -- so that the kids and everybody could live together in the house." According to Fisher, Defendant further assured her that he and Mintz "were currently separated and they lived separate in separate places."

Fisher also testified that on 17 February 2011 — two days before Mintz' murder — while Defendant was visiting Fisher at her house, Fisher discovered a text message on Defendant's phone from Mintz containing the word "love." Fisher stated that she was "furious" at that point and told Defendant to get out of her house. Fisher stated that shortly thereafter, she texted Defendant the following message:

> "I don't know who she is. If you want to be with her, then be with her. But make that choice on who you want to be with exclusively." Is what I texted him. And then I said, "Then let -- let me have an answer on Sunday. Don't talk to me till [sic] then."

Fisher further testified that after Mintz' death but before her funeral, Defendant made plans with Fisher to go out of town to Tybee Island, Georgia. Fisher found a rental house online, and Defendant gave her his credit card so that she could put down a deposit. Fisher reserved the house, but shortly thereafter called back and cancelled the reservation because she "felt something [was] wrong about the whole thing." Fisher stated that after his arrest, Defendant continued to send her "a ton of letters" from prison in which Defendant "apologized for lying to me. Some of them had sexual nasty things in them, expressing his love for me, how he was going to be financially well off once he gets out of there. For me to wait for him when he gets out of jail."

Major William Beauchene ("Major Beauchene"), Defendant's commanding officer in the United States Air Force Reserves at Pope Air Force Base, also testified for the State. He stated that at 7:53 p.m. on the same day that Mintz' body was discovered he received an email from Defendant inquiring about a $100,000.00 Serviceman's Group Life Insurance policy insuring Mintz' life. Major Beauchene stated that he "was shocked that within 10 to 12 hours [of Mintz' death]. . . I was receiving an e-mail inquiring about insurance." Major Beauchene contacted the SBI and informed SBI agents of Defendant's email, later providing the SBI with a copy of the email.

At trial, Defendant presented testimony from Taylor McGraw ("Taylor"), Defendant's son from an earlier marriage. Taylor testified that on the night of 18 February 2011, he and Defendant both slept at Defendant's house in Laurel Park, North Carolina. Taylor stated that he had arrived at Defendant's house at 10:40 p.m. and that Defendant was home at that time and was still present at the house when Taylor went to bed around midnight. Taylor further testified that Defendant owned a dog that was deaf and that "[b]ecause of the fact that it was deaf, any kind of vibrations would set it off and it would bark a lot . . . . Any time pretty much anyone walked past the room they would -- even if the door was closed, because of the vibrations, it would cause the dog to bark." He stated that if Defendant had left the house at any point that night Taylor would have been aware of it because the dog would have barked and that no such barking had occurred.

According to Taylor, Defendant woke him up around 8:00 a.m. the following morning, and they went to a restaurant for breakfast. While at the restaurant, Defendant received a phone call informing him that Mintz was dead at which point Taylor stated Defendant "was just immediately in tears and completely shooken [sic] up."

Defendant also testified on his own behalf. He stated that he had been target shooting with the Mossberg near the Asheville airport on the morning of 18 February 2011. He then collected the spent shells and placed them in his pants pockets. When

he arrived at the Lodge around 6:30 p.m., he changed clothes in the bedroom where Mintz' body was ultimately discovered the following morning. Defendant also stated that while he was at the Lodge that evening he noticed approximately $210.00 was in the cash drawer in the manager's office.

On cross-examination, Defendant testified as follows:

> Q. Mr. McGraw, I will show you what's previously been admitted and identified as State's Exhibit No. 31-Q-1. It's a shotgun shell. Have you ever seen that shell before?
>
> A. It looks to be similar to the shells that I was shooting on Friday morning, February 18th.
>
> Q. Did you shoot your wife with that shell?
>
> A. No, sir, I did not.
>
> Q. You've been present this whole trial, so you heard testimony that it was found in the floor in front of the entertainment center.
>
> A. Yes, sir, I have.
>
> Q. Do you have any explanation of how that shell might have gotten there?
>
> A. After I went shooting that day, I felt like I had pulled all of the shells out of my pocket. When I changed clothes if that one fell out of my pants, that's where it's coming from. That's the only way a shell from my gun got in the Saluda Mountain Lodge that night.

Defendant further testified that the reason he was pursuing a relationship with Fisher was that he and Mintz were in the process of separating. He also stated

that the reason he emailed Major Beauchene so soon after Mintz' death was to ensure that he had sufficient funds to pay for her funeral expenses.

On 4 June 2014, the jury found Defendant guilty of first-degree murder. The trial court sentenced him to life imprisonment without the possibility of parole. Defendant gave oral notice of appeal in open court.

## Analysis

Defendant's sole argument on appeal is that the trial court abused its discretion by allowing Agent Greene to offer an opinion to a degree of absolute certainty that the spent shotgun shell found at the scene of the crime was fired from the Mossberg. In making this argument, he contends that Agent Greene exceeded the permissible scope of expert testimony under North Carolina Rule of Evidence 702 by testifying that the spent shell was fired from the Mossberg to the exclusion of all other firearms. We disagree.

As an initial matter, we must determine whether the 2011 amendments to Rule 702 apply to the present case. In *State v. Gamez*, __ N.C. App. __, 745 S.E.2d 876, *disc. review denied*, 367 N.C. 256, 749 S.E.2d 848 (2013), we observed that

> [t]he North Carolina General Assembly amended Rule 702 of the North Carolina Rules of Evidence adopting language similar to the corresponding Federal Rule of Evidence. 2011 N.C. Sess. Law ch. 283, § 1.3. . . . [T]he amendments to Rule 702 became effective 1 October 2011 and apply to actions arising on or after that date.

*Id.* at __, 745 S.E.2d at 878.

We proceeded to hold that "a criminal action arises on the date that the bill of indictment was filed" and that "[t]he amendments to Rule 702 do not apply in . . . case[s]" where the indictment was filed prior to the effective date of the amendments to Rule 702. *Id.* at __, 745 S.E.2d at 879. In such cases, "we review [a] defendant's assignment of error under the earlier version of Rule 702." *Id.* at __, 745 S.E.2d at 879. We therefore applied the test set out in *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 597 S.E.2d 674 (2004), to the defendant's claim that the expert opinion testimony at issue had been improperly admitted. *Id.* at __, 745 S.E.2d at 879.

In the present case, Defendant was indicted on 25 July 2011. Therefore, because Defendant's indictment predated the effective date of the amendments to Rule 702, we must apply the former version of Rule 702, which stated as follows:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion.

N.C.R. Evid. 702(a).

As noted above, our application of the prior version of Rule 702 is controlled by *Howerton.* Pursuant to *Howerton,* "a trial court that is considering whether to admit proffered expert testimony pursuant to North Carolina Rule of Evidence 702 must conduct a three-step inquiry to determine: (1) whether the expert's proffered method of proof is reliable, (2) whether the witness presenting the evidence qualifies as an

expert in that area, and (3) whether the evidence is relevant." *State v. Morgan*, 359

N.C. 131, 160, 604 S.E.2d 886, 903-04 (2004), *cert. denied*, 546 U.S. 830, 163 L.Ed.2d

79 (2005).

> When making such determinations, trial courts are not bound by the rules of evidence. In this capacity, trial courts are afforded wide latitude of discretion when making a determination about the admissibility of expert testimony. Given such latitude, it follows that a trial court's ruling on the qualifications of an expert or the admissibility of an expert's opinion will not be reversed on appeal absent a showing of abuse of discretion.

*Howerton*, 358 N.C. at 458, 597 S.E.2d at 686 (internal citations and quotation marks

omitted). Here, Defendant only challenges the first prong of the *Howerton* test —

that is, whether Agent Greene's method of proof was, in fact, reliable.

In *Howerton*, our Supreme Court explained the manner in which a trial court

should assess the reliability of an expert witness' methodology.

> [T]o determine whether an expert's area of testimony is considered sufficiently reliable, a court may look to testimony by an expert specifically relating to the reliability, may take judicial notice, or may use a combination of the two. Initially, the trial court should look to precedent for guidance in determining whether the theoretical or technical methodology underlying an expert's opinion is reliable. . . . [W]hen specific precedent justifies recognition of an established scientific theory or technique advanced by an expert, the trial court should favor its admissibility, provided the other requirements of admissibility are likewise satisfied.
>
> . . . .

Where, however, the trial court is without precedential guidance or faced with novel scientific theories, unestablished techniques, or compelling new perspectives on otherwise settled theories or techniques, a different approach is required. Here, the trial court should generally focus on the following nonexclusive indices of reliability to determine whether the expert's proffered scientific or technical method of proof is sufficiently reliable: the expert's use of established techniques, the expert's professional background in the field, the use of visual aids before the jury so that the jury is not asked to sacrifice its independence by accepting the scientific hypotheses on faith, and independent research conducted by the expert.

Within this general framework, reliability is thus a preliminary, foundational inquiry into the basic methodological adequacy of an area of expert testimony. This assessment does not, however, go so far as to require the expert's testimony to be proven conclusively reliable or indisputably valid before it can be admitted into evidence. In this regard, we emphasize the fundamental distinction between the admissibility of evidence and its weight, the latter of which is a matter traditionally reserved for the jury.

*Id.* at 459-60, 597 S.E.2d at 687 (internal citations, quotation marks, and brackets omitted).

The heart of Defendant's argument is his contention that Agent Greene's methodology lacked reliability in light of the absence of a complete consensus in the criminal justice community regarding the accuracy of firearm identification. In support of this position, he points to various documents purporting to express concerns regarding the reliability of expert testimony based on this methodology,

including (1) a letter from the United States Department of Justice in connection with a specific federal criminal case; (2) the affidavit of Alicia Carriquiry, Ph.D., an expert in "[s]tatistics, relating in part to existing studies performed by firearm examiners"; and (3) a 2008 National Academy of Sciences treatise entitled "Ballistic Imaging." Based on these documents, Defendant asserts that "[d]espite precedent allowing firearms testimony without limitation, the degree of certainty to which a firearms examiner may testify is coming under increasing scrutiny. . . . The developing research and law in this area support limiting the testimony as requested in [Defendant's] pretrial motion."

We believe, however, that at most these documents show that no complete uniformity of thought presently exists regarding the reliability of firearm identification. This evidence does not rise to the level of "compelling new perspectives on otherwise settled theories or techniques" as contemplated in *Howerton*. *See id.* at 460, 597 S.E.2d at 687. Rather, *Howerton* makes clear that where established precedent favors the admissibility of evidence based on previously recognized scientific theories or methods under Rule 702, the existence of conflicting views on the reliability of such evidence goes to the *weight* to be given such evidence rather than its *admissibility*. In such instances, the proper weight to be accorded the evidence is within the province of the jury. *Id.*

It is well settled that "[c]ourts in North Carolina have upheld the admission of expert testimony on firearm toolmark identification for decades." *State v. Britt*, 217 N.C. App. 309, 314, 718 S.E.2d 725, 729 (2011). As we noted in *State v. Anderson*, 175 N.C. App. 444, 624 S.E.2d 393, *appeal dismissed and disc. review denied*, 360 N.C. 484, 632 S.E.2d 492 (2006),

> [o]ur Supreme Court has previously upheld the admission of . . . firearms or ballistics testimony. *See State v. Gainey*, 355 N.C. 73, 88-89, 558 S.E.2d 463, 473-74 (holding that the trial court did not err in admitting testimony of SBI agent regarding rifling characteristics of particular bullets based on his experience and the fact that he had tested the bullets upon which he based his opinion), *cert. denied*, 537 U.S. 896, 154 L. Ed. 2d 165, 123 S. Ct. 182 (2002); *State v. Felton*, 330 N.C. 619, 638, 412 S.E.2d 344, 356 (1992) (upholding admissibility of SBI agent's testimony regarding rifling characteristics of particular bullets). Defendant does not address this precedent, but rather argues that the State did not meet its burden because "[t]he State presented no evidence substantiating the scientific validity" of [the firearm expert's] comparisons of the bullets and the gun. As *Howerton* and *Morgan* establish, however, the State was not necessarily required to do so.

*Id.* at 449, 624 S.E.2d at 398.

Defendant does not dispute the existence of such precedent, conceding in his brief that "North Carolina . . . has upheld firearms toolmark examination for decades. . . ." However, he contends that under the *Howerton* test trial courts lack the discretion to allow firearm experts to testify to a degree of absolute certainty as to a

match between a particular gun and spent ammunition used in the commission of a crime.

This argument, however, is not supported by our caselaw. In *Anderson*, the defendant was charged with first-degree murder. The victim had been shot twice, and two bullets had been recovered from her gunshot wounds. At trial, an SBI agent testified that the bullets removed from the victim's body were fired from the defendant's gun. *Id.* at 447, 624 S.E.2d at 396-97.

On appeal, the defendant contended that the trial court erred in admitting the SBI agent's ballistics testimony under Rule 702. Specifically, the defendant argued that the agent "did not comply with 'normally accepted scientific methodology[.]'" *Id.* at 447-48, 624 S.E.2d at 397.

In applying the *Howerton* test and upholding the admission of the agent's testimony that the defendant's gun was a match to the recovered bullets, we cited to long-standing North Carolina cases allowing the admission of expert firearm and ballistics testimony, concluding as follows:

> Defendant's arguments regarding the discoloration of the bullets resulting from the bodily fluids of the victim, the corrosion of the gun, and the subjective nature of [the SBI agent's] examination go to the weight of [the SBI agent's] testimony and not its admissibility. Defendant cross-examined [the SBI agent] about the accuracy of her methods and also questioned the witness about whether ballistic evidence was a scientific certainty. It was for the jury to decide how to weigh [the SBI agent's] testimony. We, therefore, hold that the trial court did not abuse its

discretion in admitting the expert testimony.

*Id.* at 450, 624 S.E.2d at 398 (internal citations and quotation marks omitted).

*Britt* involved a similar issue. In that case, prior to trial, the defendant moved to exclude expert firearm identification testimony. *Britt*, 217 N.C. App. at 312, 718 S.E.2d at 728. The trial court denied the defendant's motion, but, in its discretion, chose to limit the testimony of the State's expert witnesses by prohibiting them from testifying that bullets recovered from the scene were fired from a particular gun to the exclusion of all other firearms. The trial court subsequently reversed its ruling and allowed the State's experts to testify without this limitation after the defendant's trial counsel argued before the jury that his own firearm identification experts would testify that the gun in question was not a match to the bullets. *Id.* at 312-13, 718 S.E.2d at 728.

On appeal, we determined that the trial court did not abuse its discretion in allowing the State's expert witness to testify without limitation, holding that "[t]he [trial] court . . . correctly followed precedent and admitted the expert testimony regarding toolmark analysis of ballistics." *Id.* at 314, 718 S.E.2d at 729.

While the circumstances surrounding the trial court's ruling in *Britt* were somewhat different than those existing here, we nevertheless believe *Britt* (like *Anderson*) demonstrates the breadth of the trial court's discretion as to the extent to which expert testimony on the subject of firearm identification is permissible.

Moreover, in *Britt*, we reemphasized our adherence to the proposition that "[o]nce the trial court determines the expert's methods are sufficiently reliable, any doubt as to the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility." *Id.* (citation and quotation marks omitted). This principle is in accord with *Howerton*.

> [O]nce the trial court makes a preliminary determination that the scientific or technical area underlying a qualified expert's opinion is sufficiently reliable (and, of course, relevant), any lingering questions or controversy concerning the quality of the expert's conclusions go to the weight of the testimony rather than its admissibility. Here, we agree with the United States Supreme Court that vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Howerton*, 358 N.C. at 461, 597 S.E.2d at 688 (internal citations, quotation marks, and brackets omitted).

Thus, the proper method for Defendant to attack the credibility of Agent Greene's expert testimony was by subjecting his opinion to thorough and rigorous cross-examination. At trial, Defendant's counsel did just that. On cross-examination, he explored in detail Agent Greene's methodology and the basis for his opinion that the Mossberg was the gun that fired the recovered shotgun shell to the exclusion of all other firearms. Indeed, in his responses to questions from Defendant's counsel, Agent Greene admitted the existence of some degree of subjectivity to his opinion.

Q. Do you follow any particular standards in making your comparison?

A. Yes.

Q. What are they?

A. They would be the standards that I have spoken about previously with creating test fires, looking for class characteristics, and either being able to include or exclude based on the class characteristics, and then looking for the individual detail. When it comes to the individual detail, I look for a sufficient quantity and quality of agreement between two items. That agreement has to exceed the amount of agreement that I have seen or that I have read about or I have knowledge of between two items that I know did not come from a common source. Basically, what means that [sic] is I have to see an amount of agreement that is greater than any agreement I have ever seen between two things that I know were fired from the same gun. On top of that, I have to see an amount of agreement that I know is consistent with items that are fired from the same gun.

Q. And to do that there are -- there's not a set number of, like, areas of similarity that you have to find to make -- to find that it's a match or declare that it is. Not like you have to find six points of agreement; right?

A. That's correct. We don't count points or numbers or anything like that for agreement.

Q. So it's based on your subjective opinion based on your training, experience, intuition, education?

A. I wouldn't say intuition, but I would agree with the rest of those.

Q. But you would agree it is subjective, isn't it?

A. Yes.

Q. Based on your opinions. So another firearm examiner could differ?

A. It's possible one could differ, but I would expect one with similar training and experience as myself to reach the same conclusion.

. . . .

Q. When you do your comparisons are there levels of certainty that you have? Like, are you 80 percent sure, 50 percent sure, or do you find that either that (sic) you claim that it's a match based on your subjective opinion or it's not a match?

A. Yes. I do no percentages. In my reports if I state an opinion, then that's 100 percent my opinion.

Q. I couldn't hear you.

A. I said I don't state any probabilities. If I state something on a report as my opinion, then that's 100 percent my opinion. It's not I'm 95 percent sure of this. That is my opinion. I'm 100 percent sure of my opinion.

Q. But because it's based on your opinion there's a possibility that you could be wrong?

A. There's always a possibility that anybody can be wrong in any opinion.

Therefore, as a result of this cross-examination, the jury heard Agent Greene's admissions that the conclusions to be drawn from his ballistics testing were subjective in nature, that it was "possible" that another firearms examiner might reach a different conclusion, and that "[t]here's always a possibility that anybody can

be wrong in any opinion." These admissions tempered — at least to some degree — the absolute nature of his opinion. It was then for the jury to determine the weight to be accorded to his opinion.

Finally, it is important to note that the jury was informed it was not required to accept Agent Greene's conclusions. Specifically, the trial court instructed the jury as follows:

> In this case have you [sic] heard evidence from witnesses who have testified as expert witnesses. An expert witness is permitted to testify in the form of an opinion in a field where the witness purports to have specialized skill or knowledge.
>
> As I have instructed you, you are the sole judges of the credibility of each witness and the weight to be given to the testimony of each witness. In making this determination as to the testimony of an expert witness you should consider, in addition to the other tests of credibility and weight, the witness's training, qualifications and experience or lack thereof; the reasons, if any, given for the opinion; whether the opinion is supported by facts that you find from the evidence; whether the opinion is reasonable and whether it is consistent with other believable evidence in the case. You should consider the opinion of an expert witness, but you are not bound by it. In other words, you are not required to accept an expert witness's opinion to the exclusion of the facts and circumstances disclosed by other testimony.

Therefore, the jury was fully cognizant that it alone had the power to determine the weight that Agent Greene's testimony should be given. *See Britt*, 217 N.C. App. at 315-16, 718 S.E.2d at 730 (referencing trial court's instruction that jury

"consider the [expert] witness' training, qualifications, and experience or lack thereof, as well as the reasons given for their opinion and the facts that support their opinion, in determining how much weight, if any, to give to the expert's testimony").

In sum, Defendant has failed to demonstrate that compelling new developments in the field of firearm identification divested the trial court of its discretion to allow Agent Greene's expert testimony without limitation. Moreover, Defendant's trial counsel was given wide latitude in conducting a thorough and rigorous cross-examination of Agent Greene concerning his methodology and opinions. In addition, the jury was properly instructed regarding its authority to determine the appropriate weight that Agent Greene's testimony should be given. Therefore, we conclude that the standards articulated in *Howerton* were properly applied and that the trial court did not abuse its discretion in allowing his testimony.[3]

## Conclusion

For the reasons stated above, we conclude that Defendant received a fair trial free from error.

NO ERROR.

Chief Judge McGEE and Judge HUNTER, JR. concur.

---

[3] In a related argument, Defendant asserts that the trial court's 30 May 2014 written order memorializing its denial of Defendant's motion to limit Agent Greene's testimony contained findings of fact unsupported by Agent Greene's *voir dire* testimony. However, after a meticulous comparison of the trial court's written order and the trial transcript, we are satisfied that the court's key findings were sufficiently supported by the evidence. Defendant's argument on this issue is therefore overruled.

Report per Rule 30(e).