MURPHY, Judge.
 

 *290
 
 The victim, Ms. Claiborne, lived with and was engaged to Defendant, Karlos Antonio Holmes. The couple had a tumultuous relationship after their engagement. On Sunday, 24 November 2013, Ms. Claiborne sent Defendant a text message telling him to move out of the home and that she would be changing the locks and continuing to request child support. Ms. Claiborne went to a concert that Sunday night and returned home afterwards. The next morning, her friends and colleagues, concerned that Ms. Claiborne was absent from work and not responding to text messages, went to Ms. Claiborne's home to check on her. Once they gained entry to the home, they found Ms. Claiborne lying dead in the bathtub along with a hair dryer. The
 
 *713
 
 police arrived and found white feathers throughout the home and a feather pillow in the room where Defendant had been staying. A subsequent autopsy found petechiae under Ms. Claiborne's eyelids and an internal bruise under her skull.
 
 *291
 
 While the forensic pathologist stated it was her medical opinion that Ms. Claiborne did not die from electrocution, he was unable to determine a cause of death with certainty. Defendant was charged with and convicted of first-degree murder.
 

 On appeal, Defendant argues the trial court erred in (A) denying his motion to dismiss the first-degree murder charge; (B) failing to instruct on the lesser-included offenses of second-degree murder and voluntary manslaughter; (C) admitting letters detailing Defendant's debts; (D) overruling his objection to a statement made by the State during closing argument; and (E) admitting testimony from two expert witnesses. We find no error in part and no prejudicial error in part.
 

 BACKGROUND
 

 Defendant and Ms. Claiborne had a romantic relationship and were the parents of a young child, Christopher
 
 [1]
 
 . Ms. Claiborne and Christopher lived in Charlotte in a home Ms. Claiborne owned. In early 2013, Defendant came to Charlotte to visit Ms. Claiborne and assist in her recovery after laparoscopic surgery for endometriosis. Defendant's move to Charlotte and his stay at Ms. Claiborne's home became permanent and the two became engaged late in 2013.
 

 As of November 2013, the two were having relationship troubles. Ms. Claiborne's cousin testified that "a lot of animosity" existed between Defendant and Ms. Claiborne and that the two barely spoke during their engagement party. Ms. Claiborne told her cousin that she did not want "to continue with the wedding because [Defendant] was having financial issues and he was basically spending all of her money and she was using all of her money for wedding stuff."
 

 On Sunday, 24 November, Christopher was with Ms. Claiborne's mother in Virginia, and Ms. Claiborne had plans to attend a concert with two friends and colleagues, Ms. Carlisle ("Carlisle") and Ms. Horne ("Horne"). Carlisle arrived at Ms. Claiborne's home before the concert to curl Ms. Claiborne's hair. Ms. Claiborne had just taken a shower and was putting on clothes, and Carlisle noted that there were no bruises on Ms. Claiborne's body when she fully disrobed. Carlisle then used a curling iron to curl Ms. Claiborne's hair. While in Ms. Claiborne's room, Carlisle noted that "everything was put up and organized nice and neat." The two then left Ms. Claiborne's home in Ms. Claiborne's BMW for the concert, where they met Horne and other friends. Ms. Claiborne and Carlisle
 
 *292
 
 arrived back at Ms. Claiborne's home at approximately 10:00 P.M. that night. Defendant's Volkswagen was not at the home when they arrived, and Carlisle watched Ms. Claiborne safely enter the home.
 

 The next morning, Horne texted a group chat with Carlisle and Ms. Claiborne, and Ms. Claiborne never responded. Carlisle then sent Ms. Claiborne an individual text message asking whether she was at work and if she was okay. Ms. Claiborne never responded. Carlisle did not "feel right about the situation," and told her supervisor that she would be leaving work for an hour. Horne texted Defendant about Ms. Claiborne's whereabouts, to which he responded:
 

 I'm sorry for the delayed response, but I just got out of a - out of a meeting for work. She went out with [Carlisle] last night, but I left early this morning and [she] wasn't there when I went to work. I'll call to check on her in a little bit, I think she had another doctor's appointment.
 

 Horne replied to the text message and asked whether Ms. Claiborne's BMW was at home earlier that day. Defendant did not respond.
 

 Carlisle and Horne went to Ms. Claiborne's home, where they found Defendant's Volkswagen, but not Ms. Claiborne's BMW. All the doors and windows to the home were locked, so Carlisle had to lift the garage door for Horne to enter through an unlocked door inside the garage. While searching for Ms. Claiborne in the home, Horne entered the bedroom and found it to be "a disaster." Her
 
 *714
 
 clothes, shoes, and bags were strewn across the floor. Horne then looked in the bathroom, where she found Ms. Claiborne unresponsive in the bathtub with a blow dryer in her lap. Horne pulled out and unplugged the blow dryer, and unsuccessfully tried to find a pulse on Ms. Claiborne.
 

 Defendant arrived at the home shortly after emergency personnel, alone and driving Ms. Claiborne's BMW. Defendant stated he was unaware that Ms. Claiborne was supposed to go to work that morning. He also told a paramedic that he had spoken to Ms. Claiborne approximately 30 to 45 minutes before he arrived at the home and that she told him she planned to take a bath.
 

 When police arrived at the scene, they found a white feather in the bathroom where Ms. Claiborne was found. They further found the furniture had been moved in Ms. Claiborne's bedroom and that her closet was "a mess[,]" with a pile of clothes, broken hangers, and Ms. Claiborne's engagement ring hidden in a shoebox under two feet of clothing. In the bedroom with an air mattress where Defendant was staying, police
 
 *293
 
 found clothing and shoes scattered across the floor and a black duffle bag across the room containing white socks in the original packaging. There were also white feathers on the floor of the room and a feather pillow behind the air mattress. A subsequent search of the kitchen revealed white feathers on wet socks found in the trashcan, and additional white feathers were found in the trash bin outside of the home.
 

 A search of Ms. Claiborne's BMW revealed a broken end table from Ms. Claiborne's bedroom, Defendant's keys to his vehicle, and a Ziploc bag containing mail. The mail in the Ziploc bag consisted of thirteen parcels addressed to Defendant containing notices of delinquent child support payments and other debts.
 

 DNA analysis indicated that Defendant's DNA was found under one of Ms. Claiborne's fingernails and on one of the ends of the hair dryer's electrical cord. The autopsy performed on Ms. Claiborne revealed a large bruise around her hip and upper thigh, a scratch on her right thigh, and petechiae inside her eyelids. The forensic pathologist found no indication that Ms. Claiborne ingested alcohol or drugs, no evidence supporting electrocution, and no water in her lungs to indicate drowning. However, because there were no "strong, solid physical indications that point to an exact thing that [caused the death]," the forensic pathologist was unable to determine a cause of death.
 

 Defendant was arrested approximately three months after Ms. Claiborne's death and was charged with first-degree murder. A jury convicted Defendant on that charge and the trial court entered judgment, sentencing Defendant to life without parole. Defendant timely appeals.
 

 ANALYSIS
 

 A.
 
 Motion to Dismiss
 

 The trial court's denial of a motion to dismiss is reviewed
 
 de novo
 
 on appeal. Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied.
 

 State v. Pressley
 
 ,
 
 235 N.C. App. 613
 
 , 616,
 
 762 S.E.2d 374
 
 , 376 (internal citations and quotation marks omitted),
 
 disc. review denied
 
 , --- N.C. ----,
 
 763 S.E.2d 382
 
 (2014). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."
 
 State v. Smith
 
 ,
 
 300 N.C. 71
 
 , 78-79,
 
 265 S.E.2d 164
 
 , 169 (1980). In
 
 *294
 
 reviewing claims of sufficiency of the evidence, we consider all evidence in the light most favorable to the State, drawing all reasonable inferences in its favor.
 
 State v. Everette
 
 ,
 
 361 N.C. 646
 
 , 651,
 
 652 S.E.2d 241
 
 , 244 (2007).
 

 To convict Defendant of first-degree murder under N.C.G.S. § 14-17, the State must prove Defendant committed: "(1) an unlawful killing; (2) with malice; (3) with the specific intent to kill formed after some measure of premeditation and deliberation."
 
 State v. Peterson
 
 ,
 
 361 N.C. 587
 
 , 595,
 
 652 S.E.2d 216
 
 , 223 (2007). Thus, to survive a
 
 *715
 
 motion to dismiss on the first-degree murder charge, the State was required to offer substantial evidence of each element and of Defendant's identity as the perpetrator of the unlawful killing. Defendant claims the State failed to meet this burden with respect to two specific elements: (1) the unlawful killing and (2) Defendant's identity as the perpetrator. We discuss each contention in turn.
 

 1. Unlawful Killing
 

 Defendant contends the State failed to show that Ms. Claiborne died by virtue of a criminal act and, therefore, failed to offer substantial evidence of an "unlawful killing." We disagree.
 

 In proving first-degree murder, the State must show that the victim's "immediate cause of death is the natural result of [Defendant's alleged] criminal acts."
 
 State v. Cummings
 
 ,
 
 301 N.C. 374
 
 , 378,
 
 271 S.E.2d 277
 
 , 280 (1980). "There is no proper foundation ... for a finding by the jury as to the cause of death without expert medical testimony where the cause of death is obscure and an average layman could have no well grounded opinion as to the cause."
 
 State v. Minton
 
 ,
 
 234 N.C. 716
 
 , 722,
 
 68 S.E.2d 844
 
 , 848 (1952).
 
 Minton
 
 , however, does not place a requirement on the State to offer expert medical testimony that arrives at a
 
 final, determined
 
 cause of death in order for the jury to make a finding as to the cause of death.
 

 Here, the State presented expert medical testimony by the forensic pathologist, Dr. Thomas Darrell Owens ("Dr. Owens"), who performed the autopsy on Ms. Claiborne. While Dr. Owens testified that he was unable to clinically determine a cause of death, the State presented substantial evidence from which the jury could determine that the cause of Ms. Claiborne's death was the natural result of a criminal act. At trial, Dr. Owens testified that the autopsy he performed revealed petechiae, red dots similar to bruising, on the inside of Ms. Claiborne's eyelids. Dr. Owens testified that petechiae are caused by pressure in the head when blood is "flowing in, but the drainage can't drain out[,]" leading to burst
 
 *295
 
 blood vessels. The presence of petechiae led Dr. Owens to believe that "there was potentially some type of pressure around [Ms. Claiborne's] upper chest or her neck and head area so that the blood got trapped and the little blood vessels popped in the skin because the blood couldn't drain out." Indeed, Dr. Owens testified that the presence of petechiae is "more consistent with pressure on the chest and neck, as in a sitting, pressing or pressure around the neck" and that such pressure, in the form of suffocation, "almost never" leaves a mark in the area where the pressure is applied.
 

 Dr. Owens also testified that he found a large bruise around Ms. Claiborne's right side around her hip in the upper part of her thigh that was less than 18 hours old, along with a superficial linear abrasion on the side of her right thigh. Carlisle testified that the night before Ms. Claiborne's death, she saw Ms. Claiborne fully naked as she was dressing and did not see such a bruise. Additionally, Dr. Owens noted a subgaleal hemorrhage on the inside of Ms. Claiborne's scalp that "would indicate her head was hit by something or her head hit into something to cause that deep bruise."
 

 Dr. Owens also offered expert medical testimony as to what, in his opinion,
 
 did not
 
 cause Ms. Claiborne's death. Ms. Claiborne's toxicology report came back negative for alcohol and all drugs tested. This was notable, as "the vast majority [of cases of suicide] are positive for alcohol" when suicide is carried out by instrumentation and suicides involving drugs usually involve high levels of drugs. Moreover, Dr. Owens ruled out drowning, as there was no water found in Ms. Claiborne's lungs. Finally, Dr. Owens found no evidence to support a finding that Ms. Claiborne died of electrocution, and it was Dr. Owens's expert medical opinion that "she did not die of electrocution."
 

 Taken in the light most favorable to the State and affording it the benefit of all reasonable inferences, the evidence presented was sufficient such that a reasonable juror could accept the evidence as adequate to support the conclusion that the cause of Ms. Claiborne's death was the natural result of a criminal act.
 

 *716
 

 2. Defendant as Perpetrator
 

 Defendant contends the State also failed to offer substantial evidence that Defendant was the perpetrator of the crime. We, again, disagree.
 

 The evidence offered by the State was circumstantial; however, "[c]ircumstantial evidence may be sufficient to overcome a motion to dismiss 'even when the evidence does not rule out every hypothesis of
 
 *296
 
 innocence.' "
 
 State v. Hayden
 
 ,
 
 212 N.C. App. 482
 
 , 484,
 
 711 S.E.2d 492
 
 , 494 (2011) (quoting
 
 State v. Stone
 
 ,
 
 323 N.C. 447
 
 , 452,
 
 373 S.E.2d 430
 
 , 433 (1988) ). When the evidence of a defendant's identity as the perpetrator is circumstantial:
 

 [C]ourts often speak in terms of proof of motive, opportunity, capability and identity, all of which are merely different ways to show that a particular person committed a particular crime. In most cases these factors are not essential elements of the crime, but instead are circumstances which are relevant to identify an accused as the perpetrator of a crime.
 

 State v. Bell
 
 ,
 
 65 N.C. App. 234
 
 , 238,
 
 309 S.E.2d 464
 
 , 467 (1983),
 
 aff'd
 
 ,
 
 311 N.C. 299
 
 ,
 
 316 S.E.2d 72
 
 (1984). Such a question of "[w]hether the State has presented sufficient evidence to identify defendant as the perpetrator of the offense is not subject to an easily quantifiable bright line test."
 
 State v. Miles
 
 ,
 
 222 N.C. App. 593
 
 , 600,
 
 730 S.E.2d 816
 
 , 823 (2012),
 
 aff'ed
 
 ,
 
 366 N.C. 503
 
 ,
 
 750 S.E.2d 833
 
 (2013). Thus, while evidence of
 
 either
 
 motive or opportunity, standing alone, is insufficient to withstand a motion to dismiss, we assess "the quality and strength of the evidence as a whole."
 

 Id.
 

 Regarding motive, the State presented substantial evidence of a tumultuous relationship between Defendant and Ms. Claiborne that was colored by Defendant's financial troubles. It was known that Ms. Claiborne and Defendant had relationship problems after their engagement and that animosity existed between the two, which was apparent at the couple's engagement party. Ms. Claiborne explicitly stated to a friend that she did not want "to continue with the wedding because [Defendant] was having financial issues and he was basically spending all of her money and she was using all of her money for wedding stuff." Additionally, the day before Ms. Claiborne was killed, she sent a text message to Defendant stating, "You have until Tuesday at 8:00 as I'm leaving to go out of town Wednesday or Thursday. And my locks will be changed. So do my [sic] act stupid. Thanks." She then sent an additional text stating, "I will also be [sic] send a request not to stop child support FYI." Law enforcement later found a Ziploc bag of notices about Defendant's child support payments and commercial debts. Defendant's financial hardships, coupled with his tempestuous relationship with Ms. Claiborne and her threat to end the relationship and remove Defendant from her home, are sufficient for a reasonable juror to conclude Defendant had motive to kill Ms. Claiborne.
 
 See
 

 State v. Gray
 
 , --- N.C. App. ----, ----,
 
 820 S.E.2d 364
 
 , 368 (2018)
 

 *297
 
 (holding "motive tended to be sufficiently established with testimony concerning the hostility that existed" between the defendant and victim).
 

 In order to show opportunity, "the State must have presented at trial evidence not only placing the defendant at the scene of the crime, but placing him there at the time the crime was committed."
 
 Hayden
 
 ,
 
 212 N.C. App. at 488
 
 ,
 
 711 S.E.2d at 497
 
 . Ms. Claiborne was found with her body already in rigor mortis. The forensic pathologist testified that the onset of rigor mortis is first noticeable in the fingers and jaw after 30 minutes to an hour after death and the body progressively stiffens over the next 6 to 8 hours. As the 911 call was placed at 11:48 A.M., this indicates that Ms. Claiborne's death occurred during the night or early morning.
 

 The State presented evidence that Defendant was in the home between the time that Ms. Claiborne returned home from the concert the night before and when her body was found the next day. Ms. Claiborne arrived home from the concert in her BMW and Carlisle watched Ms. Claiborne enter the home. When Defendant arrived the next day after Ms. Claiborne's body was found, he was driving Ms. Claiborne's BMW. Thus, Defendant was necessarily at the home during this
 
 *717
 
 time period to take possession of Ms. Claiborne's car. Moreover, the broken end table found in the BMW that Defendant was driving when he arrived at the home was circumstantial evidence placing Defendant at the scene when Ms. Claiborne was killed.
 

 Defendant argues that his presence at the home during this time is insufficient to show opportunity, as "[h]e had access to the house during this time because he lived there." However, we have made it clear that presence at or near the scene of a killing around the time it was committed is sufficient for a reasonable juror to conclude Defendant had the opportunity to commit the killing.
 
 Miles
 
 ,
 
 222 N.C. App. at 601
 
 ,
 
 730 S.E.2d at 823
 
 ("Taking the State's evidence as a whole and resolving all contradictions in favor of the State, a reasonable juror could conclude that defendant was in the vicinity of the victim's home and the scene of the crime at the time of death, thereby establishing defendant's opportunity to commit the murder.")
 

 As previously stated, a reasonable mind might accept the evidence, viewed in the light most favorable to the State and affording it the benefit of all reasonable inferences, as adequate to support the conclusion that Ms. Claiborne was suffocated to death. The State introduced evidence tending to establish that Defendant had the capability of carrying
 
 *298
 
 out this method of killing and evidence establishing his identity as the perpetrator of such an action. A white feather pillow was found behind the air mattress in the room in which Defendant stayed. Also found in Defendant's room was an opened pack of white socks still in the original packaging. White feathers were found on the floor in the bedroom, in a trash bin outside the home, and in the bathroom where Ms. Claiborne's body was found. A pair of wet white socks was found in the trashcan in the kitchen with a feather on the socks. This evidence, viewed in the light most favorable to the State, would allow a reasonable juror to conclude that Defendant had the means of suffocating Ms. Claiborne with the feather pillow found in his room and that this evidence connected Defendant to the means of the killing.
 

 Based upon this evidence, there was sufficient evidence from which a reasonable inference of Defendant's guilt could be drawn. Accordingly, it was for "the jury to decide whether the facts, taken singly or in combination, satisfy [it] beyond a reasonable doubt that [Defendant was] actually guilty."
 
 State v. Fritsch
 
 ,
 
 351 N.C. 373
 
 , 379,
 
 526 S.E.2d 451
 
 , 455 (2000). The trial court did not err in denying Defendant's motion to dismiss.
 

 B.
 
 Instruction on Lesser-Included Offenses
 

 Defendant argues the trial court erred in failing to submit an instruction to the jury on second-degree murder and/or voluntary manslaughter. Specifically, Defendant contends the evidence negated premeditation and deliberation. We disagree.
 

 "We review the trial court's denial of the request for an instruction on the lesser included offense de novo."
 
 State v. Laurean
 
 ,
 
 220 N.C. App. 342
 
 , 345,
 
 724 S.E.2d 657
 
 , 660 (2012). A trial court is required to give a jury instruction on a lesser-included offense "only if the evidence would permit the jury rationally to find defendant guilty of the lesser offense and to acquit him of the greater."
 
 State v. Millsaps
 
 ,
 
 356 N.C. 556
 
 , 561,
 
 572 S.E.2d 767
 
 , 771 (2002). Still, the "trial court should refrain from indiscriminately or automatically instructing on lesser included offenses. Such restraint ensures that the jury's discretion is ... channelled so that it may convict a defendant of only those crimes fairly supported by the evidence."
 
 State v. Taylor
 
 ,
 
 362 N.C. 514
 
 , 530,
 
 669 S.E.2d 239
 
 , 256 (2008) (citation, alteration, and internal quotation marks omitted). Our caselaw has made it clear when the trial court shall submit an instruction for second-degree murder as a lesser-included offense to first-degree murder:
 

 If the evidence is sufficient to fully satisfy the State's burden of proving each and every element of the offense of murder in the first degree, including premeditation and
 
 *299
 
 deliberation, and there is
 
 no
 
 evidence to negate these elements other than defendant's denial that he committed the offense, the trial judge should properly exclude from jury consideration
 
 *718
 
 the possibility of a conviction of second degree murder.
 

 Millsaps
 
 ,
 
 356 N.C. at 560
 
 ,
 
 572 S.E.2d at 771
 
 .
 

 In order to satisfy its burden that Defendant's act was premeditated, the State must show that "the act was thought over beforehand for some length of time, however short."
 
 Taylor
 
 ,
 
 362 N.C. at 531
 
 ,
 
 669 S.E.2d at 256
 
 (quoting
 
 State v. Leazer
 
 ,
 
 353 N.C. 234
 
 , 238,
 
 539 S.E.2d 922
 
 , 925 (2000) ). To establish deliberation, Defendant must have possessed "an intent to kill, carried out in a cool state of blood ... and not under the influence of a violent passion or a sufficient legal provocation."
 
 Id
 
 . Premeditation and deliberation are typically proven through circumstantial evidence.
 
 State v. Childress
 
 ,
 
 367 N.C. 693
 
 , 695,
 
 766 S.E.2d 328
 
 , 330 (2014). Our Supreme Court "has identified several examples of circumstantial evidence, any one of which may support a finding of the existence of these elusive qualities."
 

 Id.
 

 Such examples include:
 

 (1) absence of provocation on the part of the deceased, (2) the statements and conduct of the defendant before and after the killing, (3) threats and declarations of the defendant before and during the occurrence giving rise to the death of the deceased, (4) ill will or previous difficulties between the parties, (5) the dealing of lethal blows after the deceased has been felled and rendered helpless, (6) evidence that the killing was done in a brutal manner, and (7) the nature and number of the victim's wounds.
 

 Id.
 

 Here, the State offered substantial evidence to support a finding of premeditation and deliberation. As discussed above, Defendant and Ms. Claiborne had a tumultuous relationship with ill-will existing between the two. Ms. Claiborne planned to call off the wedding and sent Defendant a text message telling him that he needed to move out of the home and that she would be changing the locks. Moreover, she informed Defendant, who had financial troubles, that she would continue to seek child support payments. The next day her body was found. After the killing, Defendant gave inconsistent statements regarding the morning Ms. Claiborne's body was found. He told Ms. Claiborne's friend, Horne, that he left early for work and Ms. Claiborne was not there. He also stated that he thought she had a doctor's appointment. However, Defendant
 
 *300
 
 had Ms. Claiborne's BMW and the keys to his own car with him, leaving Ms. Claiborne with no vehicle the morning her body was found. Indeed, when Horne asked Defendant whether the BMW was at the home when he went to work, he never responded. Moreover, there was no evidence that Ms. Claiborne provoked Defendant in any way. Accordingly, there was substantial evidence to support the jury's finding of premeditation and deliberation.
 

 However, the sufficiency of the evidence to satisfy the State's burden in proving the elements of first-degree murder does not end our inquiry. The key issue here is whether there was evidence to negate a finding of premeditation and deliberation and support a conviction of second-degree murder. "An instruction on the charge of second-degree murder requires that the unlawful killing of a human being occur without premeditation and deliberation."
 
 Laurean
 
 ,
 
 220 N.C. App. at 347-48
 
 ,
 
 724 S.E.2d at 662
 
 . "[I]f the purpose to kill was formed and immediately executed in a passion, especially if the passion was aroused by a recent provocation or by mutual combat, the murder is not deliberate and premeditated."
 
 State v. Misenheimer
 
 ,
 
 304 N.C. 108
 
 , 113,
 
 282 S.E.2d 791
 
 , 795 (1981). Stated differently, the specific intent to kill must be "formed under the influence of the provocation of the quarrel or struggle itself" in order to negate premeditation and deliberation.
 
 Id
 
 . at 114,
 
 282 S.E.2d at 795-96
 
 .
 

 The only evidence Defendant claims negates premeditation and deliberation are the text from Ms. Claiborne telling Defendant to move out of the home and the signs of the struggle indicated by strewn clothes and broken furniture. From this evidence, Defendant claims premeditation and deliberation were negated because "the jury could have concluded" that an argument arose that "aroused a sudden passion in him." However, these two pieces of evidence do not negate premeditation and deliberation.
 

 *719
 
 Ms. Claiborne sent Defendant the text message telling him to move out of the home and that she would continue to request child support on Sunday, the day before her body was found. In order to negate premeditation and deliberation by showing a sufficient provocation, the intent to kill must be formed and immediately executed in the passion caused by that provocation. There is no evidence that Defendant formed and immediately executed the intent to kill under the provocation of that text message when he received it. Even assuming Defendant and Ms. Claiborne did later argue about the text message, "evidence that the defendant and the victim argued, without more, is insufficient to show that the defendant's anger was strong enough to disturb his
 
 *301
 
 ability to reason."
 
 State v. Solomon
 
 ,
 
 340 N.C. 212
 
 , 222,
 
 456 S.E.2d 778
 
 , 785 (1995). Nevertheless, there is no such additional evidence in the record before us.
 

 Additionally, the strewn clothes and broken furniture that Defendant says indicate signs of a struggle do not negate premeditation and deliberation in this case. Our appellate courts have never held that evidence of a struggle, fight, or victim resistance necessarily negates premeditation and deliberation.
 
 See
 

 State v. Hightower
 
 ,
 
 340 N.C. 735
 
 , 744,
 
 459 S.E.2d 739
 
 , 744 (1995) ("[A]ny attempts by [the victim] at hitting or kicking defendant on or near the dirt road prior to his stabbing her were the direct result of defendant's pursuit of her."). The mere fact that there were strewn clothes and a broken end table, alone, are not evidence that show a provocation sufficient to render Defendant incapable of deliberating his actions.
 

 We find Defendant's reliance on
 
 State v. Beck
 
 ,
 
 163 N.C. App. 469
 
 ,
 
 594 S.E.2d 94
 
 (2004),
 
 rev'd in part on other grounds
 
 ,
 
 359 N.C. 611
 
 ,
 
 614 S.E.2d 274
 
 (2005), misplaced and unpersuasive. In
 
 Beck
 
 , we held there was evidence sufficient to negate premeditation and deliberation where the defendant was "very drunk" when he went to see the victim, the victim initiated a physical attack on the defendant, and the victim made numerous threats to the defendant's child during the fight that ensued.
 
 Id
 
 . at 473-74,
 
 594 S.E.2d at 97
 
 . The record here contains no evidence of any of these circumstances that would require an outcome similar to
 
 Beck
 
 . Defendant claims the jury "could have concluded" an argument occurred that aroused a sudden passion in Defendant that negated premeditation and deliberation; however, the mere possibility of such an argument or altercation is insufficient to render the trial court's decision not to instruct on second-degree murder erroneous. Defendant has not pointed us to any evidence that he was incapable of deliberating his action or that he was unable to reason due to a sufficient provocation. Because the evidence does not establish that Defendant formed the intent to kill Ms. Claiborne under the influence of provocation such that premeditation and deliberation are negated, the trial court did not err in failing to instruct the jury on second-degree murder.
 

 The trial court similarly did not err in failing to instruct the jury on voluntary manslaughter. "Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation."
 
 State v. Norris
 
 ,
 
 303 N.C. 526
 
 , 529,
 
 279 S.E.2d 570
 
 , 572 (1981). "Killing another while under the influence of passion or in the heat of blood produced by adequate provocation is voluntary manslaughter."
 

 *302
 

 State v. Allbrooks
 
 , --- N.C. App. ----, ----,
 
 808 S.E.2d 168
 
 , 172 (2017). "To reduce the crime of murder to voluntary manslaughter, the defendant must either rely on evidence presented by the State or assume a burden to go forward with or produce some evidence of all elements of heat of passion on sudden provocation."
 

 Id.
 

 Defendant did not present such evidence, and the State's evidence does not establish a sudden provocation, much less that he acted under an "immediate grip of sufficient passion" to warrant a voluntary manslaughter instruction. Without evidence of such a provocation and heat of passion, the trial court did not err in failing to instruct the jury on voluntary manslaughter.
 

 C.
 
 Letters
 

 Defendant argues the trial court erred in admitting letters detailing his outstanding debts over his timely objection that the letters were not relevant under Rule 401.
 

 *720
 
 In the alternative, Defendant contends that the trial court abused its discretion in admitting the letters, as the probative value was substantially outweighed by the danger of unfair prejudice under Rule 403. We disagree with both contentions.
 

 "The admissibility of evidence is governed by a threshold inquiry into its relevance. In order to be relevant, the evidence must have a logical tendency to prove any fact that is of consequence in the case being litigated."
 
 State v. Griffin
 
 ,
 
 136 N.C. App. 531
 
 , 550,
 
 525 S.E.2d 793
 
 , 806 (citation and internal quotation marks omitted),
 
 appeal dismissed and disc. review denied
 
 ,
 
 351 N.C. 644
 
 ,
 
 543 S.E.2d 877
 
 (2000) ;
 
 see also
 
 N.C.G.S. § 8C-1, Rule 401 (2017). Trial court rulings on relevancy technically are not discretionary.
 
 Dunn v. Custer,
 

 162 N.C. App. 259
 
 , 266,
 
 591 S.E.2d 11
 
 , 17 (2004). However, because we have noted the trial court "is better situated to evaluate whether a particular piece of evidence tends to make the existence of a fact of consequence more or less probable," rulings on relevancy are given great deference on appeal.
 

 Id.
 

 Evidence may be excluded under Rule 403 even if it is relevant:
 

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
 

 N.C.G.S. § 8C-1, Rule 403 (2017). Rule 403 determinations "are discretionary, and a trial court's decision on motions made pursuant to Rule 403 are binding on appeal, unless the dissatisfied party shows that the trial court abused its discretion."
 

 *303
 

 State v. Chapman
 
 ,
 
 359 N.C. 328
 
 , 348,
 
 611 S.E.2d 794
 
 , 811 (2005). Abuse of discretion occurs when the trial court's ruling "is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."
 
 State v. Hennis
 
 ,
 
 323 N.C. 279
 
 , 285,
 
 372 S.E.2d 523
 
 , 527 (1988).
 

 Whether Defendant had a motive to murder Ms. Claiborne was a strongly contested issue in this case. The State alleged that Defendant was facing financial difficulties and that those difficulties created a financial motive to kill Ms. Claiborne. We have previously held that evidence of financial difficulties may be relevant to such a contested issue.
 
 See
 

 State v. Britt
 
 ,
 
 217 N.C. App. 309
 
 , 317,
 
 718 S.E.2d 725
 
 , 731 (2011) (holding that trial court did not abuse its discretion in admitting letters detailing the defendant's financial hardship because the letters "support[ed] the State's theory that defendant had a financial motive to kill his wife.");
 
 State v. Peterson
 
 ,
 
 179 N.C. App. 437
 
 , 465,
 
 634 S.E.2d 594
 
 , 615 (2006) (holding that "evidence of a potential inheritance of a great deal of money combined with current financial difficulties may be evidence of a motive for murder."),
 
 aff'ed
 
 ,
 
 361 N.C. 587
 
 ,
 
 652 S.E.2d 216
 
 (2007),
 
 cert. denied
 
 ,
 
 552 U.S. 1271
 
 ,
 
 128 S.Ct. 1682
 
 ,
 
 170 L.Ed.2d 377
 
 (2008). The letters here indeed indicated that Defendant faced financial hardships with both consumer and child support debt. This, coupled with evidence that Ms. Claiborne had threatened to remove Defendant from the home and expressed that she would continue to request child support, indicate that the letters made the existence of a financial motive to murder Ms. Claiborne more probable.
 

 Defendant attempts to distinguish this case from those where we have held evidence was relevant to a financial motive to murder, noting that the amount of debt was not as high and that Defendant stood to gain no monetary benefit from a life insurance policy. We find this argument unpersuasive. "Relevant evidence is that which has any tendency,
 
 however slight
 
 , to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence."
 
 Britt
 
 ,
 
 217 N.C. App. at 317
 
 ,
 
 718 S.E.2d at 731
 
 (emphasis added). Because Defendant's financial difficulties were "calculated to throw ... light upon the supposed crime[,]" the trial court did not err in admitting the letters.
 
 See
 

 State v. Hamilton
 
 ,
 
 264 N.C. 277
 
 , 286-87,
 
 141 S.E.2d 506
 
 , 513 (1965). The weight of such evidence was for the jury.
 
 See
 

 id.
 
 at 287,
 
 141 S.E.2d at 513
 
 .
 

 Additionally, we do not find that the trial court's Rule 403 determination that the probative
 
 *721
 
 value of the letters was not outweighed by the danger of unfair prejudice was manifestly unsupported by reason. The trial court here indeed limited the danger of unfair prejudice by
 
 *304
 
 prohibiting the State from publishing to the jury letters which indicated a criminal action against Defendant. The trial court did not abuse its discretion in admitting the letters.
 

 D.
 
 State's Closing Argument
 

 During its closing argument, the State made the remark that Defendant "has absolutely no money." Defendant argues on appeal that the trial court abused its discretion in overruling his timely objection to this statement based on his contention that the content of the statement was not in evidence. We disagree.
 

 "The standard of review for improper closing arguments that provoke timely objection from opposing counsel is whether the trial court abused its discretion by failing to sustain the objection."
 
 State v. Jones
 
 ,
 
 355 N.C. 117
 
 , 131,
 
 558 S.E.2d 97
 
 , 106 (2002). "In order to assess whether a trial court has abused its discretion when deciding a particular matter, [we] must determine if the ruling could not have been the result of a reasoned decision."
 

 Id.
 

 (citation and internal quotation marks omitted). Our Supreme Court in
 
 Jones
 
 instructed:
 

 When applying the abuse of discretion standard to closing arguments, this Court first determines if the remarks were improper. ... [I]mproper remarks include statements of personal opinion, personal conclusions, name-calling, and references to events and circumstances outside the evidence, such as the infamous acts of others. Next, we determine if the remarks were of such a magnitude that their inclusion prejudiced defendant, and thus should have been excluded by the trial court.
 

 Id.
 

 A defendant is prejudiced by a non-Constitutional error "when there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises. The burden of showing such prejudice under this subsection is upon the defendant." N.C.G.S. § 15A-1443(a) (2017).
 

 We need not decide whether the content of the statement that Defendant "has absolutely no money" referenced circumstances outside of the evidence, as Defendant has failed to show that such an alleged error prejudiced him. Preceding the statement, the State detailed Defendant's debts, all of which were in evidence. The State also noted that Defendant lived in the home that Ms. Claiborne owned. Moreover, the State acknowledged that Defendant had in fact started a new job the day Ms. Claiborne's body was found. With all of this evidence
 
 *305
 
 before the jury, there is no reasonable probability that the outcome of the trial would have been different absent the contested hyperbole.
 

 E.
 
 Expert Testimony
 

 Defendant next argues the trial court erred in admitting the expert opinions of Michael Kale ("Kale") and Michael McFarlane ("McFarlane"). We consider each in turn and find no error.
 

 It remains well-established that "the trial judge is afforded wide latitude of discretion when making a determination about the admissibility of expert testimony[,]" and the trial court's determination is reviewed for abuse of discretion.
 
 State v. Bullard
 
 ,
 
 312 N.C. 129
 
 , 140,
 
 322 S.E.2d 370
 
 , 376 (1984) ;
 
 State v. King
 
 ,
 
 366 N.C. 68
 
 , 75,
 
 733 S.E.2d 535
 
 , 539-40 (2012). "The trial court's decision will not be disturbed on appeal unless 'the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision.' "
 
 State v. Mendoza
 
 , --- N.C. App. ----, ----,
 
 794 S.E.2d 828
 
 , 834 (2016) (quoting State v. Ward,
 
 364 N.C. 133
 
 , 139,
 
 694 S.E.2d 738
 
 , 742 (2010) ). Thus, "[t]rial courts act as a gatekeeper in determining admissibility of expert testimony, and a trial court's decision to admit or exclude expert testimony will not be reversed on appeal unless there is no evidence to support it."
 
 State v. Walston
 
 ,
 
 369 N.C. 547
 
 , 551,
 
 798 S.E.2d 741
 
 , 745 (2017) (citation and internal quotation marks omitted).
 

 Under Rule 702:
 

 (a) If scientific, technical or other specialized knowledge will assist the trier of fact
 
 *722
 
 to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
 

 (1) The testimony is based upon sufficient facts or data.
 

 (2) The testimony is the product of reliable principles and methods.
 

 (3) The witness has applied the principles and methods reliably to the facts of the case.
 

 N.C.G.S § 8C-1, Rule 702 (2017). In order for expert testimony to be admissible, it must satisfy the three prongs of Rule 702 : the expert testimony must pass a relevance inquiry, the expert must be appropriately qualified, and the expert testimony must be reliable by satisfying the
 
 *306
 
 three inquiries enumerated in Rule 702(a)(1)-(3).
 
 State v. McGrady
 
 ,
 
 368 N.C. 880
 
 , 889-90,
 
 787 S.E.2d 1
 
 , 8-9 (2016).
 

 1. Kale
 

 Defendant first contends that Kale was not qualified to offer expert testimony that a running hair dryer dropped in a tub of water would not create current leakage if there is no path to the ground for the electrical current.
 

 Kale testified that he is an inspection supervisor for Mecklenburg County Code Enforcement specializing in electrical code enforcement, a position he has held for 15 years. In 2001, Kale received a Level III inspection certification, the highest level of certification for electrical inspectors. He continues to take 60 hours in continuing education classes in the field per year. Prior to his current position, Kale had been an electrical contractor since 1987. Kale stated that in the early 1980s, he began constructing electrical wiring systems and continued to do so until his current position where he switched from constructing to inspecting such systems. More specifically, Kale's current responsibilities as an inspection supervisor include checking "the installation of electrical systems and power distribution systems" by testing and visually inspecting electrical wiring to ensure compliance with national and state codes. Kale testified that an appliance with a running circuit placed in a bathtub with water, with no pathway to the ground, would not create electrical leakage, as "the only path back to ground is the circuit [to which] it's attached ...." Given Kale's knowledge, experience, and training in electrical systems, which encompasses how electricity moves, it was not an abuse of discretion for the trial court to determine that Kale had the necessary qualifications to provide this opinion.
 

 Defendant cites
 
 Leary v. Nantahala Power & Light Co.
 
 ,
 
 76 N.C. App. 165
 
 ,
 
 332 S.E.2d 703
 
 (1985) in support of his argument that Kale was not qualified. However,
 
 Leary
 
 is readily distinguishable from the case at hand. In
 
 Leary
 
 , a witness was tendered as an expert in the field of "operation and maintenance of electrical distribution systems."
 
 Leary
 
 ,
 
 76 N.C. App. at 173
 
 ,
 
 332 S.E.2d at 709
 
 . The witness, however, studied education in school, failed to complete his course of instruction as a lineman, and was responsible in his current position for "talking with prospective residential customers, obtaining rights-of-way for provision of service to their homes, determining the location of the power poles, scheduling line crews and specifying the materials to be used in providing electrical service systems to the residences."
 
 Id
 
 . In contrast, Kale began his career in the 1980s constructing electrical wiring systems and
 
 *307
 
 subsequently advanced to inspecting such systems for 15 years. While Kale lacked a post-secondary degree in electrical engineering, we have never required such a formal credential.
 
 State v. Norman
 
 ,
 
 213 N.C. App. 114
 
 , 124,
 
 711 S.E.2d 849
 
 , 857,
 
 disc. review denied
 
 ,
 
 365 N.C. 360
 
 ,
 
 718 S.E.2d 401
 
 (2011) (holding that the witness's "extensive practical experience" in the relevant fields qualified him to testify as an expert despite his lack of a formal degree). Kale's experience, training, skill, and experience in the electrical systems field are distinguishable to the witness in
 
 Leary
 
 .
 

 Defendant next contends that Kale's opinion on how an appliance would react when placed in water was not based on reliable methods. Specifically, Defendant claims that Kale "formed his opinion ... when he witnessed
 
 *723
 
 a fire department instructor throw a hair dryer into a similar tub of water" and it kept running. However, this contention mischaracterizes the testimony. After testifying to the potential effect of placing an appliance in water with respect to the electrical system, the State asked Kale, "have you ever witnessed this ... phenomenon demonstrated?" Kale's response to the question describing the demonstration he witnessed merely assisted in illustrating Kale's preceding testimony. The testimony was not an experiment "requiring substantially similar circumstances to test the validity of such a hypothesis" and did not serve as the basis for Kale's preceding opinion.
 
 See
 

 State
 

 v. Anderson
 
 ,
 
 200 N.C. App. 216
 
 , 222,
 
 684 S.E.2d 450
 
 , 455 (2009). Rather, "[the] illustration enabled the jury to better understand his testimony and to realize completely its cogency and force."
 
 See
 
 id.
 

 Defendant's argument is accordingly without merit.
 

 2. McFarlane
 

 Defendant contends the trial court abused its discretion in admitting evidence of McFarlane's experiment. McFarlane worked for the Federal Bureau of Investigation as a forensic examiner of electronic devices and was tendered as an expert in electrical systems and forensic electricity. McFarlane testified that appliances such as a hairdryer have an ALCI safety plug, which disables the electrical current going to the device when a certain amount of current leakage occurs. To test whether the ALCI on the hairdryer found with Ms. Claiborne was working and to determine the exact amount of leakage at which the ALCI would disable the current, McFarlane conducted an experiment. He set up "a trough with water in it" and attached wires to the hairdryer that he then placed in the water. At the other end of the trough, he placed additional wires to provide a secondary pathway for the current to leak to the ground. McFarlane then moved the hairdryer closer to the other
 
 *308
 
 wires to determine the exact amount of leakage from the hair dryer circuit to the secondary pathway that occurred before the ALCI plug disabled the current going to the hair dryer.
 

 "An experiment is a test made to demonstrate a known truth, to examine the validity of a hypothesis, or to determine the efficacy of something previously untried."
 
 State v. Golphin
 
 ,
 
 352 N.C. 364
 
 , 433,
 
 533 S.E.2d 168
 
 , 215 (2000) (citation and internal quotation marks omitted),
 
 cert. denied
 
 ,
 
 532 U.S. 931
 
 ,
 
 121 S.Ct. 1380
 
 ,
 
 149 L.E.2d 305
 
 (2001).
 

 Experimental evidence is competent and admissible if the experiment is carried out under substantially similar circumstances to those which surrounded the original occurrence. The absence of exact similarity of conditions does not require exclusion of the evidence, but rather goes to its weight with the jury. The trial court is generally afforded broad discretion in determining whether sufficient similarity of conditions has been shown.
 

 State v. Locklear
 
 ,
 
 349 N.C. 118
 
 , 147,
 
 505 S.E.2d 277
 
 , 294 (1998) (internal citations omitted),
 
 cert. denied
 
 ,
 
 526 U.S. 1075
 
 ,
 
 119 S.Ct. 1475
 
 ,
 
 143 L.Ed.2d 559
 
 (1999). We have held that "the substantial similarity requirement for experimental evidence does not require precise reproduction of circumstances[,]" but the "trial court must consider whether the differences between conditions can be explained by the witnesses so that any effects arising from the dissimilarity may be understood by the jury ...."
 
 State v. Chapman
 
 ,
 
 244 N.C. App. 699
 
 , 715,
 
 781 S.E.2d 320
 
 , 331 (2016).
 

 Here, McFarlane conducted the experiment to test the amount of current that would need to be leaked in order for the ALCI safety plug to disable the current going to the device. McFarlane used the same hair dryer that was found with Ms. Claiborne in the bathtub. He also used a "trough with water in it" to recreate the bathtub. Additionally, McFarlane testified that when he turned on the hair dryer, it functioned correctly with the attached wires. McFarlane's failure to say what the trough was made of or whether it had a metal drain did not render the experiment void of substantial similarity as Defendant suggests. McFarlane testified that the presence of a metal drain is relevant in determining whether the drain is connected to something that would provide
 
 *724
 
 an alternative pathway for the current to reach the ground. However, this experiment was testing the
 
 amount
 
 of leakage that causes the ALCI safety plug to disable the current and did not concern the medium through which the current travels once it is already leaked. Affording the trial court broad discretion, we do not find that the trial court abused its discretion in admitting this evidence.
 
 *309
 
 The State later asked McFarlane whether "based on your examination, using that trough of water,
 
 potentially
 
 does electricity prefer to go through this hair dryer circuit, or does it like to go through the water instead?" McFarlane responded, "Given the tap water that I was using from Quantico, Virginia, the preference of the hair dryer circuit was to go through the hair dryer and not through the water." Our review of the record and the context of McFarlane's testimony indicates that the "truth" or "hypothesis" to be tested was not the medium through which the current preferred to go. However, even assuming this test was an experiment within the meaning of our caselaw to test such a hypothesis, the trial court did not abuse its discretion in admitting the evidence in this context.
 

 We have held that "candid acknowledgment of dissimilarities and limitations of the experiment is generally sufficient to prevent experimental evidence from being prejudicial."
 
 Chapman
 
 ,
 
 244 N.C. App. at 715-16
 
 ,
 
 781 S.E.2d at 331-32
 
 (citation, alteration, and internal quotation marks omitted). The prosecutor qualified his question with the term "potentially," indicating the same result will not always happen. Moreover, McFarlane made it clear that the current continues to go through the hair dryer circuit only in "an ideal bathtub situation" where there is no alternative pathway to the ground and indicated that an alternative pathway to the ground could alter the result he observed. McFarlane was also cross-examined on whether the bathtub in question had a metal drain and what implications this could have. Accordingly, we find no error.
 

 We also reject Defendant's contention that McFarlane's testimony that the current preferred to go through the hair dryer circuit was not based on reliable methods as required by Rule 702. McFarlane testified as to the nature and behavior of electrical currents, the workings of electrical circuits, and specifically how the electrical circuit within a hair dryer works. McFarlane then explained that he was employing these principles of electricity to test the amount of current-leakage necessary to trigger the safety device on the hair dryer. From this test, McFarlane specifically indicated that, given the tap water in Quantico, Virginia and the water trough he was using, the current preferred to go through the hair dryer's electrical current. He never opined based on this test that the water definitively preferred to go through the water in Ms. Claiborne's situation. Rather, he was describing the "ideal bathtub situation" based on the nature of electricity and electrical circuits. The trial court thus acted within its discretion in its determination that McFarlane's testimony was based upon sufficient facts and data and was the product of reliable principles and methods.
 

 *310
 

 CONCLUSION
 

 The trial court did not err in denying Defendant's motion to dismiss where substantial evidence, taken in the light most favorable to the State and affording it every reasonable inference, established each essential element of first-degree murder and that Defendant was the perpetrator of such offense. Additionally, the trial court did not err in failing to instruct the jury on second-degree murder and voluntary manslaughter where there was no evidence to negate premeditation and deliberation. The trial court also did not abuse its discretion in admitting letters detailing Defendant's financial troubles where the letters were probative of a financial motive to kill the victim and were not unfairly prejudicial to Defendant. Defendant further failed to show prejudice from the State's remark that he has "absolutely no money" during closing argument when the jury heard evidence on Defendant's full financial status. Finally, the trial court did not err in admitting expert testimony and evidence of an experiment where that determination was not manifestly unsupported by
 
 *725
 
 reason. Accordingly, Defendant received a fair trial.
 

 NO ERROR IN PART; NO PREJUDICIAL ERROR IN PART.
 

 Judges CALABRIA and ARROWOOD concur.
 

 [1]
 

 A pseudonym is used to protect the privacy of the minor-child.